**RECEIVED**

JUN 2 4 2009

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

Joshua Jackson Rideout,
           Plaintiff,

v.                                                          Civil Action No.:

Eric Holder, United States Attorney General;
Michael W. Reap, Acting United States Attorney
      for the Eastern District of Missouri;
Chris Koster, Attorney General of Missouri;
Ron Barnett, Sheriff of Ripley County Missouri;          1 : 09CV00082LMB
Grady James Coble, Naylor, Missouri
      Chief of Police;
Mark T Dobbs, Sheriff of Butler County Missouri;
Danny Hugh Whiteley, Poplar Bluff, Missouri
      Chief of Police;
Jim C. Arnott, Sheriff of Greene County Missouri;
Lynn Rowe, Springfield, Missouri Chief of Police;          42 USC §1983 Complaint
Jimmie D Russell, Sheriff of Taney County Missouri;        For Declaratory and
Caroll W. McCullough, Branson, Missouri                    Injunctive Relief
      Chief of Police;
Robert Dwayne Carey, Jr., Sheriff of Boone County
      Missouri;
Kenneth M. Burton, Columbia, Missouri Chief of
      Police;
Jerry Lee, Saint Louis County Missouri Police Dept.;       JURY TRIAL DEMANDED
Daniel Isom, Saint Louis City, Missouri Chief of
      Police,

           Defendants,

## Complaint

COMES NOW, Joshua J. Rideout, Plaintiff *pro se,* and files this complaint

for injunctive and declaratory relief.  This is an action under 42 USC §1983 to

address the unconstitutionality of the registration provisions of SORNA (Sex Offender Registration and Notification Act) as an unlawful exercise of federal power and the unconstitutionality of Missouri's sex offender registration laws[1] both facially and as applied. Plaintiff requests that the District Court declare both SORNA and the Missouri registration statutes to be in violation of both the U.S. and Missouri State Constitutions and permanently enjoin all defendants from enforcing those laws.

Plaintiff alleges both SORNA and the Missouri sex offender laws are separately void for vagueness by virtue of the legislatures' omission and failure to define the term "internet," for it has both a popular and technical meaning and significance as it applies to both Plaintiff and the public at large. There is no definition contained in 18 USC §2256 for use in Chapters 109A, 109B, or 110 of such Title, and for that matter, any of Title 18 of the United States Code or the Missouri Revised Statutes in Chapter 589.

Further, Plaintiff requests that the District Court declare the definition of the "internet" to be omitted from Title 18 USC, Chapters 109A, 109B, and 110. The omission of the technical definition of the "internet," by use of the statutory construction canon '*expressio unis est exclusio alterius*' (to express or include one thing implies the exclusion of the other), nullifies the interstate and jurisdictional

---

[1] Mo. Rev. Stat., Chap. 589 *et. seq*

nexus needed to prosecute 'internet' crimes against children in the federal justice system.

## Nature of the Action

As alleged with greater particularity below, Plaintiff alleges that provisions of SORNA and the Missouri sex offender registration statutes are constitutionally vague in violation of the Due Process protections of the U.S. and Missouri Constitutions and amount to retroactive punishment, in violation of the *Ex Post Facto* clause of the U.S. Constitution and the retroactivity clause of Article I, Section 13 of the Missouri Constitution. Plaintiff also alleges that the federal and state sex offender laws further violate the Due Process, Substantive Due Process, Equal Protection, Double Jeopardy, Contracts, and Takings clauses of the U.S. and Missouri Constitutions.

Plaintiff also alleges that SORNA and the Missouri sex offender statutes violate his right to acquire, possess and protect property; his rights to travel, life, liberty; and his rights to freedom of association and religion protected by the First Amendment and the Due Process Clause of the U.S. Constitution, as well as Article I, Sections 2, 5, and 10 of the Missouri Constitution.

Additionally, Plaintiff alleges that these sex offender laws constitute cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution and Article I, §21 of the Missouri Constitution.

Further, Plaintiff alleges that SORNA and the Missouri sex offender laws violate the Separation and Distribution of Powers doctrine of the Missouri Constitution.[2] Plaintiff is challenging SORNA and the Missouri sex offender registration law.

Finally, Plaintiff alleges that both SORNA and the Missouri sex offender registration laws are facially deficient and void for vagueness by virtue of the legislatures' omission and failure to define the term "Internet" to wit: the term "Internet" is both a popular and technical term and has been omitted from Title 18 USC, Chapters 109A, 109B, and 110; specifically in 18 USC §2256, "Definitions for Chapter." The statutory construction canon, '*expressio unis est exclusio alterius*' requires specific mention of every technical term and definition, else risks unconstitutional ambiguity of the statute by means of the omission of a technical definition that the law requires.

## I.

## Jurisdiction

1)      This Court has original subject matter jurisdiction over the federal constitutional violations alleged in this Complaint pursuant to the provisions of 42 USC §1983 and 28 USC §§1331 and 1343. Pursuant to 28 USC §1367(a), this

---

[2] Mo. Const., Art. II, §1

Court has supplemental jurisdiction of Plaintiff's state law claims. This Court has jurisdiction to issue injunctive and declaratory relief pursuant to 28 USC §2201 and 42 USC §1983.

2)      Venue is proper in the Eastern District of Missouri pursuant to 28 USC §1391. Plaintiff maintains permanent residence in Naylor, Missouri.

## II.

## Parties

3)      Plaintiff, a resident of Naylor, Missouri was convicted of a "sex offense" on August 28, 2006. He has been informed that he is required to register as a sex offender as a condition of his federal supervised release. Plaintiff intends and expects to spend at least 4 days per month in residence of the home of his sister; as well as gaining employment in the neighboring county for more than the maximum 14 day provision. In addition, Plaintiff expects to attend periodic business related conferences, meetings, seminars, training, and certification procedures in Branson, Columbia, and Saint Louis; all within Missouri.

4)      Defendant Eric Holder is Attorney General of the United States and is sued in his official capacity.

5)      Holder's inclusion in this suit stems from his official obligation to defend the constitutionality of SORNA.

6)      Defendant Michael W. Reap is the Acting U.S. Attorney for the Eastern District of Missouri and is sued in his official capacity.

7)      Defendant Chris Koster is the Attorney General of the State of Missouri and is sued in his official capacity.

8)      Defendant Ron Barnett is the Ripley County Sheriff and is sued in his official capacity.

9)      Defendant Grady James Coble is the Naylor Chief of Police and is sued in his official capacity.

10)     Defendant Mark T. Dobbs is the Butler County Sheriff and is sued in his official capacity.

11)     Defendant Danny Hugh Whiteley is the Poplar Bluff Chief of Police and is sued in his official capacity.

12)     Defendant Jim C. Arnott is the Greene County Sheriff and is sued in his official capacity.

13)     Defendant Lynn Rowe is the Springfield Chief of Police and is sued in his official capacity.

14)     Defendant Jimmie D. Russell is the Taney County Sheriff and is sued in his official capacity.

15)     Defendant Caroll W. McCullough is the Branson Chief of Police and is sued in his official capacity.

16)     Defendant Robert Dwayne Carey, Jr. is the Boone County Sheriff and is sued in his official capacity.

17)     Defendant Kenneth M. Burton is the Columbia Chief of Police and is sued in his official capacity.

18)     Defendant Jerry Lee is the Saint Louis County Police Department Chief of Police and is sued in his official capacity.

19)     Defendant Daniel Isom is the Saint Louis City Chief of Police and is sued in his official capacity.

20)     Defendants in paragraphs 7-21 *supra*, are all state officials of the State of Missouri and are all sued in their official capacities.

### III.

### Standing

21)     Plaintiff is directly affected by SORNA and the Missouri sex offender laws and their unconstitutional enforcement. These federal and state statutes have directly caused a violation of Plaintiff's rights under both the U.S. and Missouri Constitutions. Additionally, Plaintiff is directly affected by the omission of the

technical term and definition of the "Internet" from 18 USC §2256, for it's inclusion in Chapters 109A, 109B, and 110 of Title 18 is needed and is instrumental in determining the meaning of the term within legislation. Thus, the requirements for Article III standing have been met.

IV.

### General Allegations

A.

### Brief Overview of the Adam Walsh Act, (SORNA)

### (P.L. 109-248, July 27, 2006); and the Jacob Wetterling Act,

### (Original SORNA) (P.L. 103-322, Sept. 13, 1994)

22)     On July 27, 2006, President George W. Bush signed the Adam Walsh Child Protection Act of 2006, H.R. 4472[3] ("AWA"), into law codified as Chapter 151 of Title 42 USC (Child Protection and Safety). The AWA repeals significant parts of the Violent Crime Control and Law Enforcement Act of 1994,[4]  signed by President William J. Clinton, which contained the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program.   The

---

[3] 109th Congress, Second Session, P.L. 109-248
[4] 103rd Congress, Second Session, P.L. 103-322

Wetterling Act was codified as 42 USC §14071-14073 (Crimes Against Children).

Title XVII of P.L. 103-322 was originally codified in Title 42 USC §§14071 *et. seq.* and was amended by:

    (a)    P.L. 104-145, §2 on May 17, 1996;

    (b)    P.L. 104-236, §3-7 on October 3, 1996;

    (c)    P.L. 105-119, Title I, §115(a)(1)-(5) on November 26, 1997;

    (d)    P.L. 105-314, Title VI, §607(a) on October 30, 1998;

    (e)    P.L. 106-386, Div. B, Title VI, §1601(b)(1) on October 28, 2000;

    (f)    P.L. 108-21, Title VI, §604(a) *et. seq.* on April 30, 2003; and

    (g)    P.L. 109-162, Title XI, Subtitle B, Ch. 5, §1153(b) on January 5, 2006.

23)    The AWA[5] on July 27, 2006 was enacted to repeal the Wetterling Act in whole and replace it with the AWA, providing "notwithstanding any other provision of this Act, this Section [repealing 42 USC §14071-14073] shall take effect on the date of the deadline determined in accordance with Section 124(a) [42 USC §16924(a)]."

---

[5] P.L. 109-248, Title I, Subtitle A, §129(b)

1.

## Overview of the Wetterling Act

## (P.L. 103-322, Sept. 13, 1994)

24) The final version of the Wetterling Act beginning the Second Session of the

109th Congress, January 5, 2006, before it was repealed by the AWA, provided,

*inter alia*:

(a) guidelines for the Attorney General to promulgate to the states programs that require sexually violent predators (SVPs) to register with the state;[6]

(b) a process for the courts to determine if a sex offender is a SVP and whether he/she should be placed on the registry;[7]

(c) a system of waivers to have a SVP removed from the registry;[8]

(d) definitions that define a "criminal offense against a victim who is a minor" to mean, *inter alia*, child pornography producers, and distributors, but excludes child pornography possession;[9] and

(e) the creation of a national internet site maintained by The Crimes Against Children Section of the Criminal Division of the Department of Justice that links and consolidates all the state websites,[10] enacted by P.L. 108-21, Title VI, §604(c), on April 30, 2003.

---

[6] See §14071(a)(1)

[7] See §14071(a)(2)

[8] See §14071(a)(2)(B)

[9] See §14071(a)(3)(A)(viii)

[10] See §14071(e)(2)

2.

## Overview of the Adam Walsh Act (AWA)

### (P.L. 109-248, July 27, 2006)

25)     Title I of the AWA, entitled the Sex Offender Registration and Notification

Act (SORNA), creates a federally-mandated, national sex offender registry law.[11]

SORNA requires, *inter alia*, individuals who are "sex offenders" to register and

maintain current information in each jurisdiction:

    (a)     where the sex offender was convicted;
    (b)     where the sex offender resides;
    (c)     where the sex offender is employed and where the sex offender
        attends school; and
    (d)     requires that individual to register prior to his release from prison, or
        no later than three *(3)* business days after any change in his residence,
        employment or student status.[12]

SORNA further requires that every state establish an internet website, publishing

information about sex offenders registered in their registry.[13]

26)     SORNA also establishes a "National Sex Offender Public Website" to be

maintained by the Attorney General, which shall include "relevant information for

each sex offender and other person listed on a jurisdiction's website," and make

"relevant information" publicly accessible.[14]  It also requires that each jurisdiction

include in the design of its own website all field search capabilities needed for full

---

[11] See 42 USC §16901-16962
[12] See 42 USC §16911(1), 16913(a)(c)
[13] See 42 USC §16918
[14] See 42 USC §16920

participation in the National Sex Offender Public Website, allowing "data-mining" to occur so that the local jurisdictions "shall participate in that website as provided by the Attorney General." [15]

27)       SORNA further establishes a three-tier classification system for sex offenders.[16] Tier I sex offenders are, among a myriad of other factors, those whose offense is punishable by one year or less imprisonment or whose offense was an assault against an adult that involves sexual contact but not a completed sexual act.[17]    Tier II sex offenders are, again among myriad other factors, those individuals whose offense is punishable by more than one year imprisonment and committed that offense against a minor.[18] Tier III classifications, the most severe of the classification tiers, include individuals whose offense is punishable by imprisonment of more than one year and involve, *inter alia*, aggravated sexual abuse of an adult or minor and occurred after that individual became a Tier II sex offender.[19] Congress did not provide a procedural mechanism for challenging a tier classification.

---

[15] See 42 USC §16918

[16] See generally 42 USC §16911

[17] See 42 USC §16911(2); also, Tier I offenders are required to register for 15 years from the date of their release from incarceration. 42 USC §16913(b); 42 USC §16916(a). However, the time for registration can be reduced to ten years if the person maintains a clear record. 42 USC §16916(b)

[18] See 42 USC §16911(3)

[19] See 42 USC §16911(4)

28)     Lastly, and perhaps most applicable to facts and circumstances of this case,

the AWA further creates new federal crimes for those individuals who, among

other things, are required to register under SORNA but nonetheless fail to do so.[20]

29)     Interestingly, Congress delegated to the Attorney General the authority "to

specify the applicability" of SORNA to "sex offenders" who are "convicted

**before**" July 27, 2006, as well as those who are "convicted before ... its

implementation in a particular jurisdiction."[21]  As such, Congress explicitly did not

decide whether SORNA would apply retroactively to persons who were convicted

before July 27, 2006, but instead authorized the Attorney General to make that

crucial decision.[22]

30)     Following all these acts and amendments, still there is no definition of the

"internet" in Title 18 USC Chapters 109A, 109B, or 110.   This produces an

unconstitutional ambiguity of the statutes by means of the omission of specifics.

---

[20] See 18 USC §2250 (entitled "Failure to Register")

[21] 42 USC §S16912(b), 16913(b), 16913(d), 16917(a)-(b) (emphasis supplied)

[22] See 42 USC §16913(d)

3.

## Inclusion of Enhancements to SORNA Laws

31)     From 1994 to 1995, child pornography offenders received a mean sentence
of 36 months confinement.[23]    The twenty-four (24) defendants convicted of
possessing illegal images received an average sentence of 15 months
confinement.[24]

32)     In Fiscal Year 2007, the federal courts sentenced 1,256 defendants for child
pornography offenses.[25]    The mean sentence for all defendants convicted of a
pornography/ prostitution offense was 109.6 months.[26]    This represents a 300+%
increase in the typical <u>imposed</u> sentence since 1995.[27]

33)     Following is an excerpt from *Deconstructing the Myth of Careful Study: A
Primer on the Flawed Progression of the Child Pornography Guidelines*, by Troy
Stabenow, an Assistant Federal Public Defender from the Western District of
Missouri:

> "Let us examine the results of these Congressionally directed changes as
> they apply to two hypothetical, but statistically typical defendants. Quoted
> statistics are derived from United States Sentencing Commission's *Use of
> Guidelines and Specific Offense Characteristics: FY 2006* report found at

---

[23] See United States Commission Report to the Congress, *Sex Offenses Against Children*, 1996,
at p.3, and table 1
[24] *Id.*
[25] See 2007 Sourcebook, available at http://www.ussc.gov/ANNRPT/2007/SBT0C07.htm.
[26] *Id*. at Tables 13, 14
[27] *Id*. at Table 28

http://www.ussc.gov/gl_freq/06_glinexgline.pdf and the 2007 Sourcebook, http://www.ussc.gov/ANNRPT/2007/SBT0C07.htm.

Defendant #1.
Convicted of distributing child pornography.  Sentenced pursuant § 2G2.2. Specific Offense Characteristics:
  - Possessed a picture depicting a child under the age of 12 (96.2%)
  - Used a computer (96.8% of defendants)
  - Possessed one picture involving bondage (63.2%)
  - E-mailed 5 pictures to another person in expectation of getting 5 pictures back (49.9% of defendants receive some type of distribution enhancement)
  - Possessed four short movie clips and ten pictures resulting in a calculated 310 pictures (53.6% had greater than 300, 85.5% had greater than 10)

Defendant #1 has no criminal history and has never abused or exploited a child.  He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A [*id.* at 33], we can easily calculate his guideline range:

| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | 108-135 months |
| November 1, 2004: | 188-235 months |

Percentage increase in the low end of the Guideline Range after Acceptance since 1987: 1,567%.

Actual increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines: 167 months.

If we simply add the extra 10 second movie clips to this collection, defendant #1 charts as follows:

| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | **121-151 months** |
| November 1, 2004: | **210-262 months** |

This would result in a 1,750% increase, or a 198 month increase over a defendant sentenced for the same conduct on October 30, 1991.

Defendant #2. [similar to Defendant #1, but not charged with distribution] Convicted of possessing child pornography. Sentenced pursuant to §2G2.2. Specific Offense Characteristics:

- Possessed a picture depicting a child under the age of 12 (93.5%)
- Used a computer to obtain the image (93.1%)
- Had one disk containing two movie files and 10 pictures, equating to 160 pictures (38% had at least 150 pictures, 63.1% had greater than 10 images)

Defendant #2 has no criminal history and has never abused or exploited a child. He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A [*id*. at 33], Defendant #2 receives this Guideline Range:

| April 30, 1987: | No punishment - not illegal |
| November 1, 1991: | 6-12 months |
| November 27, 1991: | 12-18 months |
| November 1, 1996: | 21-27 months |
| April 30, 2003: | 30-37 months |
| November 1, 2004: | 41-51 months |

Percentage increase in the Total Offense Level after Acceptance since 1991: 683%

Increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines: 41 months.

A comparison of defendant #1's case to the guidelines for two similar offenses demonstrates the absurdity of this result."[28]

34)   As evidence of such controversy, Plaintiff "demonstrate[s] that the guidelines were dramatically skewed upwards by the efforts of two DOJ attorneys, who used a novice Congressman to backdoor changes into a major bill, over the objection of the Sentencing Commission, which specifically stated that no careful study or review had been allowed. Thus, the assumption of careful study becomes unfounded, and the resulting Guidelines are worthy of little respect."[29]

---

[28] Stabenow, *Deconstructing the Myth*, at 24-25 (July 2, 2008)

[29] *Id*. at 26;

See also Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter Phillips) at 983 n.185, 986; See *id* Attachment 2;

"This additional component of the Protect Act, Pub. L. No. 108-21(2003), modified §2G2.2 and §2G2.4, nullified the ability of judges to consider many downward departures for child pornography defendants, and drastically changed the statutory penalties for child pornography offenses. See Attachment B [*id*. at 35] for a copy of relevant portions.

The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnapping, and to address virtual child pornography. Phillips at 967-984. As the legislation progressed, Freshman Congressman Tom Feeney proposed an unrelated amendment to the bill that would directly amend various Guidelines. *Id*.; See also *United States v. Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004). Representative Feeney later admitted he was just the "messenger" for two Justice Department officials who authored the provision and **chose not to notify or consult the Sentencing Commission.** Phillips, at 983 n. 185, 986; [emphasis added in Phillips].

Debate on the amendment was limited to twenty minutes. *Id*. at 983. The House later passed the Child Abduction Prevention Act with the Feeney Amendment added. *Id*. at 992-994. Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, that these changes were being made without adequate review and analysis, the Protect Act became law April 30, 2003. *Id*. at 990-992 n.219.

Numerous members of Congress objected to these changes, and the procedure by which they were introduced, including Senators Ted Kennedy and Patrick Leahy. *Id*. at n.215. Senator Leahy *Footnote continued on the next page.*

35)     Modifications to SORNA that occurred after its inception now include the

removal of all count intervention for determination of risk to the public and any

process to dispute a tier classification.    There exists now no waiver or means to

remove anyone from the sex offender registry or for that matter prevent initial

---

explained, 'The substance of the Hatch-Sensenbrenner amendment - whether in the form that
was voted on in conference, or in the form that was circulated after the conference adjourned - is
just as outrageous as the way in which it was adopted. This amendment modifies in very limited
ways the Feeney amendment, which was added to the bill on the House floor after only 20
minutes of debate. This far-reaching proposal will undermine the federal sentencing system and
prevent judges from imposing just and responsible sentences.' *Id*.: See also 149 Cong. Rec.
S5137-01, 5145 (daily ed. Apr. 10, 2003)(statement by Sen. Leahy).

As was later noted by the Federal Public Defender for the Western District of Washington in
a letter to Congress, 'the Feeney Amendment received virtually no attention or debate is
inexplicable unless one assumes that it was produced at a time and in a way designed to escape
detection and debate before its passage.' See *Materials From Interested Groups Opposing
Original Feeney Amendment* at 15 Fed.Sent.R. 346, 2003 WL 22208850 (Vera Inst.Just.)

Contained in both the original Feeney Amendment and the final version of the Protect Act,
was a direct amendment to U.S.S.G. § 2G2.2 and 2G2.4, adding up to a five-level increase
depending on the number of images possessed. See Protect Act, Pub.L. 108-21, § 401(i)(1)(B),
(C). The Act also directly amended §2G2.4 by adding enhancement for 'material that portrays
sadistic or masochistic conduct' *Id*. Finally the Protect Act also adjusted mandatory minimum
sentences and statutory sentencing maximums for child pornography offenses. No research,
study, body of experience, or rationale, was provided to justify the arbitrary specific offense
enhancement amounts, nor the choice of the triggering quantities for the two to five point
enhancement related to the number of images of child pornography. Nor was there any
justification provided for § 2G2.4(b)(4)'s new 4-level enhancement.

When the Commission created § 2G2.4 in 1991 (due to Congress making it a federal offense
to possess child pornography), it did not include a four-level enhancement for 'material that
portrays sadistic or masochistic conduct.' The history of § 2G2.2 and 2G2.4 shows us that this
was an intentional act. In 1990, the Commission added the sadistic conduct enhancement to §
2G2.2. See U.S.S.G. Appendix C [*id*. at 38-40], Amendment 325. However, in drafting and
promulgating § 2G2.4, no such enhancement was included. Compare U.S.S.G. § 2G2.2 (1991)
with U.S.S.G. §2G2.4 (1991). This exclusion should be presumed to be intentional. See *Duncan
v. Walker*, 533 U.S. 167, 173 (2001) (if language is included in one section of a statute but
excluded in another section of the same Act, it is presumed that the exclusion was done
'intentionally and purposefully'). The Sentencing Commission's expert analysis did not compel
this enhancement in possession cases. In other words, this enhancement was not necessary to
fulfill the purposes of sentencing in possession cases. And so long as the Commission's expert-
*Footnote continued on the next page.*

publication of the offender's identifying information for the world to see. Last, but certainly not least, Congress has now included possession of child pornography as a registerable offense, subjecting the states to unprecedented levels of monitoring offenders that have paid their debt to society - possibly for life. Along with that addition, they also forced into the Sentencing Guidelines, without the Sentencing Commission's input, the issue of "double-counting" the use of a computer in furtherance of the crime of §2G2.2 when it is already included in the base offense specification.

---

based conclusions controlled, the possession Guideline remained unaltered in this respect. But this all changed with the passage of the PROTECT Act.

Without consulting the Commission or conducting any other research into the necessity of applying this enhancement to simple possession, Congress directly amended the possession of child pornography Guideline. Inserted into § 2G2.4 was the new subsection (b)(4). See Pub.L. No. 108-21, § 401. With this move - and without any explanation or justification Congress began to sentence the mere possession of child pornography as akin to trafficking of child pornography. It was Congressional actions like this that ultimately compelled the Sentencing Commission's reluctant consideration of § 2G2.2 and 2G2.4. See U.S.S.G. Appendix C [*id.* at 38-40], Amendment 664.

> As summarized by one commentator, with the passage of the PROTECT Act:
> Congress directly amended [for the first time] the Federal Sentencing Guidelines by drafting Guideline text. In the past, Congress often ... issue[d] directions to and requests for study from the Commission, but left it to the Commission to craft specific Guideline text. This time, Congress completely ignored the expert role the Sentencing Commission was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications.

Steven L. Chaneson, *Hoist With Their Own Petard?,* 17 Fed. Sent'g Rep. 20, 23 & nn. 54-57 (2004) (emphasis original); see also *Detwiler*, 338 F.Supp.2d at 1171. Of even greater significance, Congress acted in this way without giving either the Judicial Conference or the Sentencing Commission 'a fair opportunity to consider and comment' on the direct amendment. See Chanenson, 17 Fed. Sent'g Rep. at n.56 (citing, e.g. *Letter from the Judicial Conference of the United States to Senator Orrin G. Hatch* (April 3, 2003), reprinted at 15 Fed. Sent'g Rep. 343, 343 (2003))."

Stabenow, Deconstructing the Myth, at 18-20.

36)     Due Process was effectively removed from the Constitutional rights of

offenders, as well as retroactively applying punishment to past offenders, violating

the Contract Clause, Takings Clause, Equal Protection Clause, and implicating the

First, Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution.


B.

## Elements of the 18 USC §2250(a) Offense

37)     The AWA amended Title 18 of the criminal code, creating the new federal

criminal offense of "failure to register."[30]  That new criminal offense provides the

following in relevant part:

(a)    In general. –Whoever - -
       (1)    is required to register under the Sex Offender Registration and
              Notification Act; [and]
       (2)
              (A)    is a sex offender as defined for the purposes of the Sex
                     Offender Registration and Notification Act by reason of a
                     conviction under Federal law (including the Uniform Code of
                     Military Justice), the law of the District of Columbia, Indian
                     Tribal law, or the law of any territory or possession of the
                     United States; or
              (B) travels in interstate or foreign commerce, or enters or leaves, or
                     resides in, Indian country; and
       (3)    knowingly fails to register or update a registration as required by the
              Sex Offender Registration and Notification Act;

       shall be fined under this title or imprisoned not more than 10 years, or
       both.[31]

---

[30] See 18 USC §2250

38)     Subsection (a) of the statute provides a statutory maximum of 10-years' imprisonment for anyone convicted of failure to register.[32]   If the individual charged with failure to register "commits a crime of violence," then that individual has a mandatory minimum sentence of five years imprisonment, which "shall be in addition and consecutive to the punishment provided for the violation in subsection (a)."[33]

39)     Stated simply, the AWA specifies that it is a crime for an individual (1) who is required to register under SORNA (such as an individual with a prior sexual offense - as defined by SORNA); (2) travels in interstate commerce to a different state to reside or work; and (3) then subsequently fails to register as a sex offender in that state.[34]

## C.

## SORNA's Registration Requirements, as well as

## 18 USC §2250, Are Unconstitutional

40)     Both the registration components of SORNA, as well as the new offense of "failure to register" set forth in 18 USC §2250, are unconstitutional for a myriad of reasons.   The AWA violates the following and other provisions of the United

---

[31] See 18 USC §2250(a)
[32] See 18 USC §2250(a)(B)(3)
[33] See 18 USC §2250(c)(1)
[34] See 18 USC §2250(a)

States Constitution: (1) the Non-Delegation Doctrine, Art. I, §1; (2) the Commerce Clause, Art. I, §8; (3) the *Ex Post Facto* Clause, Art. I, §9; (4) the Due Process Clause (both procedural and substantive) of the Fifth and Fourteenth Amendments; (5) the Administrative Procedures Act; (6) the Tenth Amendment; and (7) the Equal Protection Clause, Fourteenth Amendment, §1; the Double Jeopardy, Takings, and Contracts Clauses, and the First, Fourth, and Eighth Amendments.

1.

## Congress Impermissibly Delegated to the Attorney General the Decision of Whether SORNA Would Apply Retroactively to Persons Convicted Prior to the July 27, 2006 Enactment of the AWA

41)    As an initial matter, Plaintiff asserts that Congress impermissibly delegated the crucial decision of whether the AWA should be applied retroactively.[35] Retroactive laws are highly disfavored because, among other things, they fail to give individuals proper notice and upset settled expectations.[36] The Supreme Court has made clear that "Congress is manifestly not permitted to abdicate or to transfer to others the essential legislative functions with which it is [constitutionally] vested," *Panama Refining Co.v. Ryan*, 293 US 388, 421; 55 S.Ct. 241, 248

---

[35] See 42 USC §16913(d)

[36] See, e.g., *Landgraf v. USI Film Products*, 511 US 244, 265, 114 S.Ct. 1483, 1497(1994)

(1935)[37]    Instead, the *Ryan* Court made clear that Congress may only leave to "selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply."[38]

42)    Plaintiff asserts that this is exactly what Congress did in the AWA. It placed the crucial prosecutorial decision (i.e., whether or not to retroactively expose individuals to criminal liability) in the hands of the Executive Branch via the Attorney General.

43)    For the reasons stated, Plaintiff argues that Congress' delegation to the Attorney General of the important decision of whether the AWA applies retroactively was an impermissible delegation of constitutionally-prescribed, legislative authority.[39]

---

[37] See *Panama Refining Co.v. Ryan*, 293 US 388, 421; 55 S.Ct. 241, 248 (1935)

[38] 293 US at 421, 55 S. Ct. at 248 (holding that Congress had unconstitutionally delegated the Executive Branch the authority to prohibit transportation of excess petroleum, which would be subject to fine or imprisonment); see *ALA Schechter Poultry Corp. v. US*, 295 US 495, 550, 55 S.Ct. 837, 852 (1935) (holding that Congress had unconstitutionally authorized the Executive Branch to prescribe codes of fair competition, the violation of which would be a misdemeanor offense)

[39] See *Panama Refining Co*., 293 US at 421, 55 S.Ct. at 248; *ALA Schechter Poultry Corp.*, 295 US at 550, 55 S.Ct. at 852

2.

## Congress Lacks the Power to Force Individuals Convicted of Sex Offenses

## Which Do Not Affect or Burden Interstate Commerce to Register

## as Sex Offenders -- SORNA Violates the Commerce Clause

44)     Section 2250 is unconstitutional on its face and as applied to Plaintiff, as it

violates the Commerce Clause. In order to violate 18 USC §2250, a defendant must

first be "required to register under the [SORNA]."[40]  However, Congress lacks the

authority to direct individuals convicted of offenses which do not affect or burden

interstate commerce to register as state sex offenders.  Therefore, Congress could

not constitutionally require Plaintiff, who was convicted of an offense which did

not affect or burden interstate commerce, to register under SORNA.  Thus, the first

element of SORNA cannot be met.

45)     SORNA creates affirmative requirements for "sex offenders" to register with

their local jurisdiction.[41]   As described above, SORNA's definition of "sex

offender" includes citizens who have been convicted under federal and state

criminal laws, even if their offense has no relation to interstate activity or

commerce.[42]   The registration requirements are not directed to the states, but to the

---

[40] 18 USC §2250(a)(1)
[41] 42 USC §§16913-16916
[42] 42 USC §16911

individuals. For example, 42 USC §16913(a) requires a sex offender to "register and keep the registration current, in each jurisdiction where the offender resides."

46)     Congress may only enact legislation pursuant to the powers specifically delegated to it by the Constitution.[43]    SORNA does not itself explain under what authority Congress imposes the registration requirements, but the only power through which Congress could conceivably enact them is its power "[t]o regulate Commerce with foreign Nations, and among the several states, and with Indian Tribes."[44]   However, under modern Commerce Clause jurisprudence, as articulated in *Lopez*, 524 US 549 (1995); *US v. Morrison* , 529 US 598 (2000); and *US v. Jones*, 529 US 848 (2000), it is clear that Congress *does not* have the power to impose registration requirements on individual citizens convicted of purely *intra*state offenses. Plaintiff's conviction was such *intra*state activity or at least his activities did not affect or burden *inter*state commerce.

47)     As the Court articulated in *Morrison*, "modern Commerce Clause jurisprudence has 'identified three broad categories of activity that Congress may regulate under its commerce power.'"[45]   First, Congress may regulate the use of and channels of *inter*state commerce, such as interstate highways, the mail or air

---

[43] *US v. Lopez*, 514 US 549, 552 (1995)

[44] U.S. Const. Art. I §8, cl. 3

[45] *Morrison,* 529 US at 608-09 (quoting *Lopez*, 514 US at 558)

traffic routes.[46]  Second, Congress can regulate and protect the instrumentalities of *inter*state commerce or persons or things in *inter*state commerce.[47]    Finally, Congress can regulate those activities that have a *substantial* effect on *inter*state commerce.[48]

48)    The registration requirements have nothing to do with the channels of *inter*state commerce. "§16913 does not involve commerce of any sort of economic activity. It regulates the registration of a person, a non-economic unit."[49]    Hence the registration requirements cannot be supported by Congress' power to regulate them. Further, the registration requirements are imposed on individuals who are not in interstate commerce or have any connection to interstate commerce.[50]  Thus, the second *Lopez* category, protecting the instrumentalities of, or things in *inter*state commerce, cannot apply. The registration requirements can therefore only be upheld if they regulate "those activities that substantially affect *inter*state commerce."[51]    In *Lopez* and *Morrison*, the Court set forth several factors that indicate whether a regulation can be upheld as an activity that *substantially* affects *inter*state commerce.

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] See *US v. Myers*, 591 F.Supp.2d 1312 (S.D. Fla. 2008) at 1335, (quoting *US v. Waybright*, 561 F.Supp.2d 1154, 1166)

[50] *Id.*

[51] *Lopez*, 514 US at 558-59 (emphasis added)

49)     As an initial matter, it is relevant whether the activity regulated has an economic character.[52]  In *Lopez*, the Gun-Free School Zones Act was struck down in large part because "neither the actors nor their conduct ha[d] a commercial character, and neither the purposes nor the design of the statute ha[d] an evident commercial nexus."[53]     Similarly, the registration requirements have no commercial character, or any relation to economic activity of any kind.[54]  The stated purpose of SORNA is "to protect the public from sex offenders and offenders against children."[55]  These purposes have no economic character.

50)     The second factor examined in *Lopez* and *Morrison* is whether the statute contained a "jurisdictional element" such as a requirement of travel across state lines for the purposes of committing the regulated act.[56]     Although SORNA's criminal provision requires a sex offender to "travel in interstate commerce" in order to qualify him for federal prosecution, the registration requirements contain no such jurisdictional element.[57]  The registration requirements apply to citizens

---

[52] *Morrison*, 529 US at 611 ("*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of interstate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor")

[53] 210 US at 559-60

[54] See *Myers*, 591 F.Supp.2d at 1335; see also *Waybright*, 561 F.Supp.2d at 1166

[55] 42 USC §16901

[56] *Morrison*, 529 US at 611-12

[57] 42 USC §16913-16916

whose criminal activities are purely *intra*state, and who never travel(s/ed) in *inter*state commerce.

51)    The statute does not, however, require that the sex offender travel in *inter*state commerce in furtherance of a crime that affects *inter*state commerce.[58] Thus, it is evident that the statute requires no jurisdictional nexus between *inter*state travel and any crime or any effect on commerce.  On its face and as applied to Plaintiff, therefore, there is an insufficient nexus between Plaintiff (or anyone for that matter) traveling from New York to Missouri, and how that travel affected *inter*state commerce.    Because the statute fails to require that the individual traveled in *inter*state commerce with the intent to commit a specified crime, it does not meet the requisite jurisdictional nexus to affect commerce.  As such, the law is unconstitutional on its face and as applied to Plaintiff.

52)    Finally, under *Morrison*, courts must examine the extent of the relationship between the regulated activity and its effects on commerce.[59]    There is no indication in the statute, or anywhere else, that the activities sought to be regulated by SORNA have any effect on commerce at all, not even an attenuated one.  Nor can such an effect be hypothesized by the aggregate economic effects that sex crimes and sex offenders inflict upon society.  The Supreme Court has flatly

---

[58] See *Id.*

[59] 529 US at 612

rejected the notion that the aggregate effect on *inter*state commerce of local criminal activity can be used to justify the invocation of Congress' Commerce Clause power.[60]    Nor can the costs of crime control or the effects of crime on "national productivity" support the use of the Commerce Clause to regulate *intra*state criminal activity.[61]

53)    Moreover, this analysis is not affected by the Supreme Court's most recent Commerce Clause case, *US v. Raich*, 545 US 1 (2005). In *Raich*, the Court held that the application of the Controlled Substances Act ("CSA") provision criminalizing the distribution and possession of medical marijuana was legally enacted under the Commerce Clause, even if the marijuana was locally grown, consumed locally, and never traveled in *inter*state commerce. The Court held that because marijuana is a commodity that has an interstate market, the CSA is connected to "economic" activity and is therefore a valid exercise of Congress' Commerce Clause powers;

> "[U]nlike those at issue in *Lopez* and *Morrison* the activities regulated by the CSA are quintessentially economic. 'Economics' refers to 'the production, distribution, and consumption of commodities,' *Webster's Third New International Dictionary* 720 (1966). The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, *inter*state market. Prohibiting the *intra*state

---

[60] *Morrison*, 529 US at 617

[61] *Lopez*, 514 US at 564; *Morrison*, 529 US at 598, 612-13

> possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product."[62]

54) Clearly this reasoning has no application to SORNA, which in no way regulates anything resembling economic activity. SORNA, whose stated purpose is "to protect the public from sex offenders and offenders against children," 42 USC §16901, far more closely resembles the statutes struck down in *Lopez* and *Morrison.*

55) As U.S. District Judge William J. Zloch, from the Southern District of Florida opined in *US v. Myers*, 591 F.Supp.2d 1312 (S.D. Fla.), December 9, 2008:

> "SORNA is not a comprehensive economic regulation of an interstate market . . . there is no market for sex offenders; . . . there is no market for the personal information of sex offenders . . . the information is mandated by Congress to be readily accessible by the public over the Internet. . . . Thus its commercial value, if it ever had any, becomes zero."[63]

SORNA does not involve commerce of any sort. [64]

---

[62] *Raich*, 545 US at 25-26 (emphasis added)

[63] *Id*. at 1332

[64] *Id*. at 1335;

"First, §16913 does not involve commerce of any sort of economic activity. It regulates the registration of a person, a non-economic unit. See *Waybright* ,561 F.Supp.2d at 1166.[↺]

Second, there is no express jurisdictional element to limit the registration of sex offenders to a discrete set of cases. In fact, §16913 does not contain any jurisdictional element at all. It is a blanket regulation falling upon all sex offenders, whether or not they have traveled across state lines or whether or not they undertake any action related to interstate commerce. See *id*. at 1165; *US v. Thomas* 534 F.Supp.2d 912, 920 (N.D. Iowa, Feb. 13, 2008). [↺]

It regulates a person who is a sex offender without reference to any activity affecting – or not affecting – interstate commerce that he may undertake. See 42 USC §16913(a) ('A sex offender shall register . . .'). [↺]

*Footnote continued on the next page.*

56)     The *Myers'* Court concluded that Congress' action of enacting SORNA

admittedly aids Congress in its goals to protect the public, but it is not among

Congress' enumerated powers. "Congress has never been accorded the general

police power it has sought to exercise in SORNA."[65]   "Cases are legion that note

that the federal government does not have the residual power held by the states."[66]

57)     "[T]he powers of the legislature are defined, and limited; and that those

limits may not be mistaken, or forgotten, the Constitution is written."[67]     The

---

[. . . .] Third, neither the statute nor its legislative history contain any congressional findings
as to how the regulation of sex offenders affects interstate commerce. *Thomas* 534 F.Supp.2d at
920. Nothing links the registration of sex offenders with interstate commerce. [↵]

[footnote: 'Courts are differential to the factual findings made by congress that prompt it into
legislative action. See *Gonzales v. Carhart*, 550 US 124, 167 L.Ed.2d 480 (2007).   Without a
record made by Congress, to articulate a link between the mere existence of a sex offender and
interstate commerce, and without the Government offering one in its briefing, the Court is unable
to conclude that one exists.' (footnote in original)]. [↵]

While the Court is mindful that Congress is not required to make such findings to support its
legislation, they are to be considered when looking at a statute of dubious constitutionality.
*Morrison*, 529 US at 612 (noting that such findings 'enable us to evaluate the legislative
judgment that the activity in question substantially affect[s] interstate commerce, even though no
such substantial effect [is] visible to the naked eye'), quoting *Lopez,* 514 US at 563. [. . . ]   [↵]

Fourth, because there is nothing to link the registration of sex offenders with interstate
commerce, any continued link is not only attenuated by illusory. *Morrison*, 529 US at 612
(looking to 'whether the link between the regulated activity and a substantial effect on interstate
commerce is attenuated') [↵]

Therefore under *Morrison*, the Court cannot conclude that the individual behavior of a sex
offender registering or failing to register under §16913 has substantial impact on interstate
commerce. [↵]

Thus Congress has exceeded its commerce power in the passage of §16913 and the Court strikes
down the same today."

*US v. Myers*, 591 F.Supp.2d at 1335-1336 (footnotes and internal citations in original) (line
breaks added for clarity)

[65] *Id*. at 1349; See *Lopez* 514 US at 596-98 (Thomas J. concurring); *Cohens v. Virginia,* 19 US (6
Wheat) at 426

[66] See *Lopez,* 514 US at 584-602 (Thomas J. concurring); *Id*. at 1349

[67] *Id*. *Myers* at 1349. (quoting *Maybury v. Madison,* 5 US (1 Cranch) 137, 175; 2 L.Ed 60 (1803))

*Myers'* Court finishes by quoting *Lopez*,[68]    "Therefore, the statutes challenged herein [42 USC §16901 *et seq.* and 18 USC §2250] cannot be upheld.    Section 16913 transgresses entirely the limits set on Congress by the Commerce Clause.    It cannot be defended except by adulteration of the text of the Constitution and controlling caselaw . . . It is no way a regulation of persons in interstate commerce but an exertion of general police power through an illusory and impermissible jurisdictional nexus."[69]    The Court found and declared 42 USC §16913 and 18 USC §2250 to be an unconstitutional exercise of Congress' Commerce Clause power.

58)    Each of these four factors indicates that the registration requirements are unconstitutional. First, the regulated activity has no economic character.  Second, the registration requirements contain no jurisdictional element.  Third, the statute contains *no* congressional findings indicating a link with *inter*state commerce.  Finally, the regulated activities have an insufficient effect on interstate commerce to support an exercise of Commerce Clause power.  For all these reasons, the Court must hold the registration requirements unconstitutional in this action for declaratory judgment.[70]

---

[68] *Lopez*, at 552-553 (citing *Gibbons v. Ogden,* 22 US (9 Wheat) at 189-95)

[69] *Id*. *Myers* at 1349-50

[70] In *Morrison,* after applying all of these factors, the Court ruled that "[g]ender motivated crimes of violence are not, in any sense of the phrase, economic activity," and struck down the Violence Against Women Act as an impermissible use of Congress' power under the Commerce *Footnote continued on the next page.*

59)     For the reasons stated above, the registration requirements of SORNA are unconstitutional. Because it is necessary for a defendant to be "required to register under the Sex Offender Registration and Notification Act" in order to violate §2250, and Plaintiff cannot be required to register under SORNA because the registration requirements are unconstitutional.

3.

## The AWA Violates the *Ex Post Facto* Clause

60)     The crime alleged in the indictment purports to punish persons for acts committed prior to the passage of SORNA, which is a violation of the *Ex Post Facto* Clause of the Constitution.[71]

61)     The *Ex Post Facto* Clause law applies if the legislation's intent was to impose punishment.[72] Additionally, the Court has stated that if "the intention of the legislature was to enact a regulatory scheme that is civil and non-punitive, [the Court] must further examine whether the statutory scheme is so punitive in purpose or effect as to negate [Congress'] intention to deem it civil," *Smith v. Doe*, 538 US

---

Clause. 529 US at 613. Similarly, in *Lopez,* the Court held that the Gun Free School Zones Act, "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 US at 561

[71] See U.S. Const., Art I, §9

[72] See *Id.*

84, 92; 123 S.Ct. 1140, 1147 (2003)[73]  If the reviewing court therefore determines that the legislature had intended to establish civil proceedings, it must then examine whether that challenged statutory scheme is indeed "so punitive in purpose or effect, then the *Ex Post Facto* Clause applies."[74]

62)　　　The *Ex Post Facto* Clause also "restricts governmental power by restraining arbitrary and potentially vindictive legislation," *Weaver v. Graham,* 450 US 24, 58-59; 101 S.Ct. 960, 964 (1981)[75]  The genesis of this restriction is the concern that a legislature's response "to political pressures poses a risk that they may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals," *Landgraf v. USI Film Products*, 511 US at 266 (1994).[76]  It cannot be disputed that political pressure has made sex offenders a very unpopular group in our country.[77]

---

[73] *Smith v. Doe*, 538 US 84, 92; 123 S.Ct. 1140, 1147 (2003)

[74] *Id.*

[75] *Weaver v. Graham,* 450 US 24, 58-59; 101 S.Ct. 960, 964 (1981)

[76] *Landgraf*, 511 US at 266; 114 S.Ct. at 1497

[77] See generally Shiela T. Caplis, *Got Rights? Not if You're a Sex Offender in the Seventh Circuit*, 2 Seventh Cir. Rev. 115 (2006) (describing the convicted sex offender as "perhaps the most despised and unsympathetic member of American society")

　　The Missouri Supreme Court found on February 19, 2008, that the amended Missouri Revised Statute §566.147.1, which made it a class D felony for certain sex offenders to establish a residence within 1,000 feet of a school, was unconstitutional.

　　Previously, the Circuit Court in Cole County held that the amended version of the statute interfered with the quiet use and enjoyment of property.  Additionally, the Court found the statute to be punitive because it required affected persons who lived within 1,000 feet of a school before its amendment to vacate their residences or face probation or parole revocation and felony prosecution, and was retrospective in operation.

*Footnote continued on the next page.*

(63)    Plaintiff contends that the AWA is criminal and punitive in nature. Alternatively, even if the AWA is civil and non-punitive, Plaintiff asserts that the statutory scheme of the AWA was "so punitive in purpose or effect as to negate [Congress'] intention to deem it civil."[78]

(64)    SORNA was intended by Congress to be punitive in nature.[79] For example, the AWA: (1) broadens the class of offenders subject to registration;[80] (2) lengthens the duration of registration;[81] (3) creates classes of offenders;[82] (4) reduces the time frame for the affected individual to advise officials of *any* changes

---

The Circuit Court specifically differentiated its ruling from that of the Eighth Circuit's opinion upholding the Constitutionality of Arkansas' sex offender residency restrictions, which contained an exemption for sex offenders living within the designated distance from a school when the statute was enacted. See Prison Legal News, July 2007 at 40.

Therefore, the law was in violation of Article I, §13 of the Missouri Constitution, and Article I, §10 of the U.S. Constitution that protects against retrospective and *ex post facto* laws. The statute also violated the equal protection laws in violation of Article I, §2 of the Missouri Constitution and the 14th Amendment of the U.S. Constitution. See *R.T. v. Missouri DOC*, No. 07AC-0000269 ( Cir. Ct. Cole Co. 2007).

The State appealed; the Missouri Supreme Court affirmed the lower Court's ruling. The Court held that "The Constitutional bar on retrospective civil laws has been a part of Missouri law since the State first adopted its first Constitution in 1820," citing *Doe v. Phillips*, 194 S.W.3d 833, 850 ( Mo. banc 2006), a decision that overturned a statute requiring registration of sex offenders who committed offenses prior to that law's effective date.

"As with the registration requirements in *Phillips*, the residency restrictions at issue in this case impose a new obligation upon R.L. and those similarly situated by requiring them to change their place of residence based solely upon offenses committed prior to the enactment of the statute," the Missouri Supreme Court found. See *R. L. v. State of Missouri DOC*, 245 S.W.3d 236 (Mo. 2008). See also Clarke, "Retroactive Residency Restrictions for Missouri Sex Offenders Unconstitutional," Prison Legal News, Vol. 20, No. 5 (May 2009) at 40, 41. ISSN 1075-7678.

[78] *Smith,* 538 US at 92; 123 S.Ct. at 1147
[79] See *Smith,* 538 US at 93-96; 123 S.Ct. at 1147-49
[80] See 42 USC §16911
[81] See 42 USC §16915
[82] See 42 USC §16911

to his registration information;[83] and (5) increases the penalties for violating any of its registration requirements.[84]

(65)    Furthermore, Congress' stated purpose of SORNA was to "protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against the victims listed below."[85]    Congress stated this purpose without finding that sex offenders indeed have a high risk of recidivism or that public notification would promote public safety. [86]

66)    The *Washburn Law Journal*, Vol. 47, p. 490 opines that SORNA's stringent requirements are punitive rather than rehabilitative.  Other than sex offenders, no offenders in the criminal justice system face national lifetime registries.[87]

67)    For these reasons, the SORNA requirements are overlong in duration and overbroad in scope.[88]    They call for former offenders to register when these

---

[83] See 42 USC §16913

[84] See 18 USC §2250;

Interestingly, prior to the passage of the Act, it was only a misdemeanor for an individual to fail to register as a sex offender. Compare 42 USC §14072(i) with 18 USC §2250 (making failure to register a felony punishable by up to ten years in prison). Congress has repealed this misdemeanor provision. See P.L. 109-248, Title I, §129

[85] Compare Pub. L. 109-248, §102 with *Smith*, 538 US at 93; 123 S.Ct. at 1147

[86] See DOJ:BJS, *Recidivism of Sex Offenders Released from Prison in 1994*, missing table, Exhibit 1;

See generally, Michael Vitiello, "ARTICLE: *Punishing Sex Offenders: When Good Intentions Go Bad*," 40 Ariz. St. L. J. 651 (2008). 30 years of sex offender laws present risks far different from those giving rise to registration laws. "Lack of coherence and unwarranted punishment: one size does not fit the crime or the criminal." *Id.* Examines whether long prison sentences for sex offenders are warranted in light of the need to incapacitate particularly dangerous offenders. *Id.*

[87] Bureau of Justice Statistics: Criminal Record Systems Statistics, available at http://www.ojp.usdoj.gov/bjs/crs.htm
(last visited Jan. 26, 2008)

offenders do not have a risk of future dangerousness.[89]    Furthermore, while the

SORNA requirements apply to all convicted sex offenders without regard to their

threat to public safety, the requirements are also limitless as to the public's access

to the offender's information.[90]    Public notification without any sort of risk

assessment or treatment of the offenders hinders rather than advances public

safety.[91]

---

[88] Human Rights Watch, *No Easy Answers: Sex Offender Laws in the U.S.* at 12 (2007), available at http://hrw.org/reports/2007/ us0907/us0907web.pdf. *No Easy Answers* is the first comprehensive study in the United States regarding sex offender policies, their impact on public safety, and their effect on former offenders. Human Rights Watch, *Sex Offender Laws May Do More Harm Than Good* (2007) available at http://hrw.org/english/docs/2007/09/06/usdom161819.htm. The Human Rights watch released the 146-page report on September 12, 2007. Human Rights Watch, *No Easy Answers: Sex Offender Laws of the U.S.*, *supra* note 1, at 3. "[The] length of time during which a former offender must register and be included in online registries is set arbitrarily, based on the nature of the crime of conviction and not on any assessment of the likelihood that the former offender continues to pose a safety threat." *Id*. at 5. "Courts upholding SORNA against *ex post facto* claims have advanced the argument that if any portion of the defendant's criminal actions occurred after the passage of the Act, then there was no retrospective application of the penalties under SORNA. (See e.g. *US v. Adkins*, 2007 U.S. Dist. LX 90737 at *12). Thus, defendants that traveled between states prior to the passage of SORNA could be prosecuted. (See e.g. *US v. Pitts*, 2007 U.S. Dist. LX 82632 at *13-*17). This argument turns the *ex post facto* clause on its head. The government would be free to punish any criminal conduct that occurred prior to passing a statute as long as it included an element of interstate travel and the interstate travel occurred subsequent to the passage of the law." Corey Rayburn Yung, *One of These Laws is Not Like the Others: The Federal Sex Offender Registration and Notification Act Raises New Constitutional Questions*, forthcoming, Harv. J. L. & Pub. Pol'y (2009) available at http://ssrn.com/abstract= 1193871

[89] *Id*. at 3

[90] Memorandum from Amy Baron-Evans & Sara Noonan on the *Adam Walsh Child Protection and Safety Act of 2006* at 11, 17 (Nov. 20, 2006), available at http://www.fd.org/pdf_lib/adam%20walsh%20part%20ii.pdf; Baron-Evans & Noonan, note 12, at 41

[91] See generally, Jennifer Bellott, *NOTE: To Humiliate or Not to Humiliate: Does the Sentencing Reform Act Permit Shaming as a Condition of Supervised Release?*, 38 U. Mem. L. Rev. 923 (2008) Supervised release is meant to ease a defendant's transition back into the community; the *Footnote continued on the next page.*

68)    False statistics on sex offender recidivism has prompted both politicians and

society to believe that more stringent sex offender requirements are necessary to

ensure the protection of our society.[92]    To gain support for proposed sex offender

laws, politicians often cite offender recidivism rates that are as high as eighty to

ninety percent.[93]    Evidence actually shows however, that recidivism rates for sex

offenders are only around twenty-five percent.[94]    In fact, some studies show that as

few as 3.5 percent of all new sex offenses that if followed through conviction, are

committed by sex offender recidivists of the most severe tier that are required to be

on the registry.[95]    The remainder, (over ninety-five percent) are committed by

individuals not required to be on any type of registry.

---

intent is to preclude the imposition of punitive supervised release conditions would necessarily prohibit judges from imposing supervised release conditions that involve public humiliation. *Id*
[92] Human Rights Watch, *No Easy Answers: Sex Offender Laws in the US*, *supra* note 1, at 4
[93] *Id.*
[94] *Id.*
[95] Posting of Linda4Justice to Life & Times Blog, http://

www.kcet.org/lifeandtimes/blog/index.php?p=219&kcet _play=1 (Oct. 16, 2007, 05:44 EST). Sex offenders represent ten to thirty percent of states' prison populations. Bumby, Talbot, & Carter, *supra* note 147, at 2. From 1980 to 1994, convicted sex offenders in prisons increased more than 300%, far outpacing the expansion of the prison population generally. *Id*. Between 10,000-20,000 sex offenders leave prison each year. *Id*. These sex offenders, on average, have served three to five years in prison - nearly twice as much time as those prisoners convicted of non-sex offenses. *Id*. These large numbers alone create challenges with the sex offender population re-entering society upon serving prison sentences. *Id*.

Within three years from their release, law enforcement officials re-arrested almost half of the sex offenders for new crimes and over one-third returned to prison. *Id*. Specifically, over one-third of those new arrests occurred within six months of the sex offender's release, and well over half of the new arrests occurred during the first year. *Id*. Courts convicted only 3.5% of those sex offenders returning to prison for another sex crime. *Id*. The majority (71%) returned to prison for technical violations of release conditions and most of the remainder (23.9%) returned to prison to serve sentences for non-sex offenses. *Id*.

69)    Studies also show sex offenders have only a 0.5% reconviction rate for

another sex offense of those previously convicted of a sex offense.[96]    Is this

(50/9691) enough to justify states implementing strict registries in excess of $2.7

Billion that have the potential to undermine the Constitution?[97]    Over 93 percent

of sex offenses against children are by family members or acquaintances.[98]    The

sexual abuse of a child by a stranger previously convicted of a sex offense,

therefore, is a rare event.[99]

70)    Non-registered individuals commit ninety-five percent of all sex offenses.[100]

Registration requirements, therefore, have the potential to prevent only a very

small fraction (0.5%) of future sex offenders.[101]

---

[96] See DOJ:BJS, *Recidivism of Sex Offenders Released from Prison in 1994*, (November 2003), NCJ 198281, p.14, 30, noting data "(not shown in chart)"; and the compiled missing table at Exhibit 1

[97] See Tracy Brown, The Providence Journal, *Implementing Sex Offender Registration Laws May Prove Impossible*, March 15, 2009

[98] Human Rights Watch, *No Easy Answers: Sex Offender Laws in the U.S.*, *supra* note 1, at 4; see *supra* note 120; see also DOJ: Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Sex Offenders Released from Prison in 1994*, November 2003 NCJ 198281, p.36, Table

[99] Human Rights Watch, *No Easy Answers: Sex Offender Laws in the US*, *supra* note 1, at 4
[100] See posting of Linda4Justice, *supra* note 169

[101] See *id*. Furthermore, residency restrictions hinder law enforcement supervision of former offenders. See Catherine Saillant, *Sex Offender is Free -- And Reduced to a Riverbed*; L.A. Times, Sept. 8, 2007, available at http://www.latimes.com/news/ local/la-me-mental9,0,3896403.story?coll=la-home-local. Residency restrictions exclude former offenders from living in entire communities and force them to live far away from their families, jobs, treatment, and other supportive networks. See *id*

Residency restrictions force the offenders to move far away to rural areas, become homeless, or fail to register and continue living in the community. Baron-Evans & Noonan, *supra* note 12, at 40. Even if the offenders continue to register, law enforcement has trouble keeping track of these offenders when they live in such remote areas. *Id*. Thus, the "banishment of offenders *Footnote continued on the next page.*

71)    Community notification allows any individual, corporation, or organization access to sex offender registration information.[102]    In many cases, activists discover offenders' addresses through Internet sex offender registries.[103] Offenders receive threatening mail and phone calls.[104]    Even worse, activists burn and vandalize offenders' homes.[105]    Some offenders move and fail to update their

---

through residency requirements only hinders the ability of law enforcement to monitor the offenders and keep the public safe." *Id.*; See Exhibit 1

[102] Baron-Evans & Noonan, *supra* note 12, at 40

[103] Human Rights Watch, *No Easy Answers: Sex Offender Laws in the U.S.*, *supra* note 1, at 78-99

[104] *Id.* Only fourteen states and the District of Columbia have statutes prohibiting the use of sex offender registration information to harass, discriminate, or terrorize convicted offenders: California, Connecticut, Idaho, Hawaii, Kentucky, Massachusetts, Mississippi, New Jersey, New York, Pennsylvania, South Carolina, Utah, Vermont, and Virginia. *Id.* at 90, n.308

[105] *Id.* at 7. In 1986, Richard R. molested his stepdaughter, a crime for which he served time in a New Jersey prison until 1999. *Id.* at 86. Two weeks after his release from prison, notification went out to his community. *Id.* Neighbors threw garbage in his yard, rang his doorbell and ran away, drove by his house and yelled obscenities like, "Stop fucking little girls! I'm going to kill you!" *Id.* On one occasion, a man with a mask knocked on his door then crouched down. Richard R. opened the door and the man pointed a gun at him, threatening, "If you don't get out of this neighborhood I'm going to kill you." *Id.* The man fled, but a few days later, Richard R. moved away from the community. *Id.*

William E.'s story is more tragic. Maine required William E. to register as a sex offender for having consensual sex with his fifteen-year-old girlfriend when he was nineteen-years-old, a crime for which he served two years in state prison. *Id.* at 91. William E. moved to a trailer out in the woods upon his release from prison. *Id.* Soon after, a man came to William E.'s doorstep, and when William E. opened the door, the man shot him in the face. *Id.* at 91-92. The man looked up William E.'s address on the Maine online registry and killed him because he thought he was a pedophile. *Id.* at 91. William E. was one of two convicted sex offenders on Maine's online registry that the man shot before killing himself. *Id.* William E.'s mother spoke to the Human Rights Watch about her son: "Without the registry, he would still be alive today. . . . He was not a violent person, but he was killed because someone thought he was." *Id.* at 91-92

On July 11, 1993, 2:05 AM, the Lynnwood Fire Department received a report of a structure fire, reports Jerry Bergsman with the Seattle Times, in an article "*Home Burns On Day Rapist Was To Arrive -- Fire Marshal Thinks Arsonist Attended Earlier Protest Rally*" on July 12, 1993. Upon arrival to the scene, the ramshackle house was fully involved with flames. *Id.* A convicted child rapist, Joseph G. planned on moving back to his family home upon release from prison after a 4 year sentence. *Id.* Earlier the night before a rally was excited when the community *Footnote continued on the next page.*

registry information and vigilantes mistakenly target innocent homeowners because their addresses appear on the registry.[106]

72)     Furthermore, readily available personal information about former offenders allows neighbors, colleagues, classmates, employers, and others to shun and ostracize the offenders.[107]    Offenders cannot find employment and, when they do, employers fire them when the employers discover their employees are former offenders.[108]    Homelessness and joblessness not only make the offenders more difficult for law enforcement to supervise, but also create recidivism and threaten

---

found that a sex offender would be moving into the area. *Id*. Investigators believe it was one of these participants that turned vigilante. *Id*. One resident said of the fire, "I'm happy; I'm glad; I have six children. Now I'm not sure how to explain it to them." *Id*. Following this event, state legislators say that they are working together to make it even tougher on child molesters in the future. *Id*. The DOC then bumped Joseph G. up to the highest level of supervision. *Id.*

[106] Baron-Evans & Noonan, *supra* note 12, at 41.; see generally Amber Bagley, *COMMENT: 'An Era of Human Zoning': Banishing Sex Offenders From Communities Through Residency and Work Restrictions*, 57 Emory L. J. 1347 (2008) It is a sad 20th Century commentary that society views the convicted felon as a social outcast. He has done wrong, so we rationalize and condone punishment in various forms. We express a desire for rehabilitation of the individual, while simultaneously we do everything to prevent it. *Id*.

[107] Saillant, *supra* note 174 (discussing how "a tangle of sex offender laws, court orders and public fear can produce unintended consequences.") Walter D.'s story is a good example of how sex offender laws can produce unintended consequences. Human Rights Watch, *No Easy Answers: Sex Offender Laws in the U.S.*, *supra* note 1, at 80. In 1986, "Walter D. Unknowingly solicited an underage prostitute," a crime for which Walter D. served time in a Washington state prison until 1992. *Id*. Walter D. now registers as a sex offender and his picture appears on Washington's online registry, and as Walter D. confessed to the Human Rights Watch, "I will never be given a second chance. It doesn't matter how long I don't re-offend, I will always be a sex offender in everyone else's eyes." *Id*. Specifically, at least four different employers have fired Walter D. from his job as a computer technician after his colleagues discovered his profile on Washington's online registry. *Id*. Furthermore, most landlords will not rent to him when they find out he is a registered sex offender, and when Walter D. does find a place to rent, flyers with his registration information appear in his new neighborhood within weeks. *Id*

[108] Baron-Evans & Noonan, *supra* note 12, at 40

public safety.[109]    The stigma and harassment of former offenders diminish the
likelihood of a successful transition back into society.[110]

73)    For these reasons, SORNA's registration and community notification
requirements do not have a rational connection to the non-punitive purpose of
offender rehabilitation and public safety.    Thus, the severity of SORNA's
requirements unduly burden nonviolent sex offenders who are unlikely to
recidivate but who are included in registries and community notification
information.[111]

---

[109] See Richard Roesler, *Sex Offenders Without Addresses Throw Notification Systems for a Loop*, Spokeman Review, Sept. 6, 2005, available at
http://www.spokesmanreview.com/tools/story_pf.asp?ID=88953.  An Oregon sheriff spent several months searching for a landlord to rent to Bruce E., a convicted sex offender.

Human Rights Watch, *No Easy Answers: Sex Offender Laws in the U.S.*, *supra* note 1 at 95. When the sheriff was unsuccessful, Bruce B. began living in a tent in a yard behind the jail he just left, homeless and without a job. *Id*. at 95-96;  See also Mark Martin, Chronicle Sacramento Bureau, *California's Most Unwanted: Restrictions on Residency Make Nomads of Paroled Sex Offenders*, June 2, 2006. The new California residency limitations on sex offenders have pushed six ex-cons to live and sleep on cots in the Fairfield parole office for the last 3 weeks. *Id*.  Parole officer desperately search for places for the sex offenders to live. *Id*. That week, police in Hayward handed out 300 fliers to residents because 7 paroled child molesters moved into a local motel. *Id*.  Delson, a licensed clinical social worker for 30 years confirms there is no relation between residency and commission of a crime. *Id*.  A DOJ study found that 93% of offenses are perpetrated by family members. Yet the state continues to push for tougher regulation and sanctions. *Id.*

[110] Baron-Evans & Noonan, *supra* note 12, at 40;  See generally, *NOTE: Shame Stigma, and Crime: Evaluating the Efficiency of Shaming Sanctions in Criminal Law*, 116 Harv. L. Rev. 2186 (2003). The Community has little trouble linking the imposition of the shaming penalty to the identity of the offender. The consequence is that the government's actual imposition of the shaming penalty is only the beginning of the offender's punishment. *Id*

[111] See generally, Steven Garvey, ARTICLE: *Can Shaming Punishments Educate?,* 65 U. Chi. L. Rev. 733 (1998) *Lex Talionis*, or "eye for an eye" punishments are examined. Usually the offender is forced to make a public apology, in which case the ritual is best seen as a shaming penalty, since the emphasis is more on the shame of a public confession and less on the meaning of the apology itself . . . . *Id.*

74) As further evidence of Congress' punitive intent, it placed the crime for failing to register in Title 18 (a criminal part) of the United States Code.[112] The previous misdemeanor offense for failure to register that was repealed by the AWA is set forth in Title 42 of the United States Code, entitled "Public Health and Welfare."[113] Amendments proposed by Senator Feeney added to the Protect Act directly amended the Sentencing Guidelines without the Commission's input, also increased the punitive nature of the guidelines and SORNA[114] by not following the statutory norms of legislation.

75) For the foregoing reasons, SORNA violates the *Ex Post Facto* Clause of the Constitution.[115]

76) It is significant to note that the District Court in *ACLU v. Masto,* 2:08-CV-00822-JCM-PAL (D. Nev., Oct. 7, 2008) concluded that state sex offender

---

[112] See 18 USC §2250(a); *Smith*, 538 US at 92, 123 S.Ct. at 1147

[113] See USC §14072(i); See generally, Dan Markel, ARTICLE: *Are Shaming Punishments Beautifully Retributive? Retributivism and the Implications for the Alternative Sanctions Debate*, 54 Vand. L. Rev. 2157, (2001) The new Alternatives: Shame, Guilt, and the Private Prison. A shaming punishment "sets an example for others and provides the public with a tangible sense of justice in action." *Id.* That question invites a nice comparison between private prisons and shaming punishments. *Id.*

[114] Stabenow, *Deconstructing the Myth*, at18.

[115] See *US v. Smith*, 481 F.Supp.2d 846, 851 (S.D. Mich. 2007); *US v. Barnes*, No. 7 cr. 187, 2007 WL 2119895, at *5 (S.D. N.Y. July 23, 2007) (rejecting the government's position that "knowledge of the state law requiring registration is equivalent to knowledge of 'SORNA's' requirements"; and noting, "The Constitutional mandate that defendants be given adequate notice and fair warning applies not only to what conduct is criminal but to the punishment which may be imposed.")(unpub.)

registration laws were punitive in nature and therefore violated the *Ex Post Facto* Clause of the U.S. Constitution.[116]

4.

## SORNA Violates Plaintiff's Procedural and Substantive

## Due Process Rights

77)    Plaintiff may not challenge the registration or designation process prior to registering.

78)    SORNA violates the Due Process Clause because there is no mechanism to challenge registration or designation.   Plaintiff asserts that, because SORNA neither provides for a reasonable, timely hearing or even a petition process prior to publishing his name on the sex offender internet registries or being compelled to comply with other reporting conditions, SORNA violates both the procedural and substantive components of the Due Process Clause of the Fifth Amendment to the Constitution.[117]

---

[116] Sarah Agudo, COMMENT: *Irregular Passion: The Unconstitutionality and Inefficiency of Sex Offender Residency Laws*, 102 N.W. U. L. Rev. 307 (2008).  Given the ineffectiveness of residency laws... repealing the residency law may cure the constitutional tension and provide a more effective means of sex crime control. *Id.*

[117] SORNA provides for a hearing in only a very narrow set of circumstances.

79)    SORNA imposes, *inter alia*, automatic sex offender status, public notification on the Internet, and tier-level risk classifications.[118]    It imposes such without a hearing to assess risk of recidivism or current dangerousness of the affected individual.

80)    Plaintiff asserts that the lack of a pre-registration meaningful hearing violates his procedural due process rights, as there is no procedural method for Plaintiff to challenge the validity of a prior conviction prior to his name being published on the internet registries (both state and federal registries required under SORNA).

81)    This, in turn, can lead to a violation of his substantive due process rights because he (or any other individual) may be deprived of liberty when his name is listed on the state and federal registries and is compelled to comply with the other reporting/registration portions of the AWA, even if he had not actually been convicted of an offense that Congress listed as a qualifying "sex offense" in SORNA.[119]

---

[118] See Pub.L. 109-249, §637 (requiring the Attorney General to assemble a task force to study the risk-based systems and report back within 18 months)

[119] This may occur, among other avenues, when a prior conviction is overturned or expunged, or the person is pardoned. There is no avenue in SORNA to challenge the publication of an individual's name on the registry.

82)     Both the Missouri and federal sex offender databases would most definitely constitute "stigma plus" as first set forth in *Paul v. Davis,* 424 US 693 (1976)[120] and therefore implicates Plaintiff's liberty interest protected by the Due Process Clause.[121]    The *Doe v. Lee*, 132 F.Supp.2d 63 Court reasoned that the Plaintiff had met the "stigma" portion of the test because "the registry suggests that Plaintiff is currently dangerous,"[122] while he asserts that he is not. The Court deemed the "plus" component satisfied by the fact the registration duties imposed upon the Plaintiff altered his status under state law.[123]    Having thus found that the law deprived the Plaintiff of a protected liberty interest, the District Court held that the state had not satisfied the mandate of the Due Process Clause because it had failed to afford the Plaintiff any notice or opportunity to be heard on the issue of his current dangerousness before disclosing his registry information to the public.[124]

83)     A "stigma" is the shame or disgrace attached to something regarded as socially unacceptable.  Publication of the Missouri sex offender registry and the federal counterpart, plainly "stigmatizes" the people on it insofar as it asserts that they are persons convicted of crimes characterized by the state and federal governments as being sexual offenses.  But these assertions are concededly true.

---

[120] *Paul v. Davis,* 424 US 693, 47 L.Ed.2d 405 (1976)
[121] See *Doe v. Lee*, 132 F.Supp.2d at 63-66
[122] *Id*. at 63
[123] *Id*. at 64-66
[124] *Id*. at 66

The gravamen of "stigma" as part of a due process violation is making under color of law of a reputation-tarnishing statement that is false.[125]

84)    Subsequently, the Court in *Doe v. DPS ex rel. Lee*, 271 F.3d 38 (2nd Cir. 2001) addresses the Government's allegation asserting:

> "that the registration requirements constitute only a 'minimal burden' on registrants, an intrusion no more onerous than that which the federal and state tax laws impose on all citizens and no more inconvenient than the type of obligations one encounters when completing census questionnaires or renewing a driver's license. The notion that meeting the burdens of the [state] registry law ... is comparable to paying taxes or complying with census and driving registration regulations is *breathtaking*."[126]

85)    Similar to SORNA, the Los Angeles ordinance requiring registration of all felons, interstate and intrastate to register within 5 days of stay in the city. This was addressed in *Lambert v. California,* 355 US 225 (1957),[127] where the Supreme Court found unconstitutional defects with the ordinance and reversed the conviction. Just as with SORNA, this required no "element of willfulness ... as a

---

[125] See *Codd v. Velger*, 429 US 624, 627; 51 L.Ed.2d 2 (1977) (*per curiam*)(holding that Plaintiff was not entitled to hearing with respect to derogatory statements about him because "nowhere in his pleadings or elsewhere has [he] affirmatively asserted that [the statements at issue here] substantially false"); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2nd Cir 1980)("To constitute deprivation of liberty interest, the stigmatizing information must both be false and made public.., by the offending governmental entity.") (alterations in original; citation and internal quotation marks omitted); See generally, Lara Farley, NOTE: *The Adam Walsh Act: The Scarlet Letter of the Twenty-First Century*," 47 Washburn L. J. 471 (2008) As the most heinous sex crimes reduce in proportion with minor sex offenses, the Adam Walsh Act imposes even more severe and unfair registration requirements across the board, without distinguishing between violent and non-violent offenses. *Id*. This shifts monitoring of the most severe offenders to strain local jurisdictions while the most severe offenders are the ones most likely to recidivate. *Id.*

[126] *Id*. at 58-59 (emphasis added).

[127] *Lambert v. California*, 355 US 225; 2 L.Ed.2d 228 (1957)

condition necessary for conviction."[128]   Also "due process places some limits on [local government's policing power it is to] exercise. Ingrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges; notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a plethora of situations where a penalty or forfeiture might be suffered for mere failure to act."[129]

86)     The *Lambert* Court continues to opine the purpose of the registration ordinance.  "At most the ordinance is but a law enforcement technique designed for the convenience of law enforcement agencies through which a list of the names and addresses of felons then residing in a given community is compiled ... even though [Lambert's] default was merely innocent[, s]he could but suffer the consequences of the ordinance, namely, conviction with the imposition of heavy criminal penalties there-under."[130]

87)     What makes the *Lambert* case so ironic is that 50+ years ago, no one could have imagined the inception of the "internet" and the unbelievable ability to access practically all information known to the world, past or present, in a "matter of seconds."   The differences between the *Lambert* registry and SORNA are the

---

[128] *Id.* at 231
[129] *Id.* at 231 (internal citations omitted)
[130] *Id.* at 229

public accessibility factor. *Lambert*'s registry was only an internal registry for law enforcement that disallowed dissemination.    SORNA is so much more than that and still does not allow for any due process. SORNA *does* allow for public hysteria. *Lambert*'s registry was facially deficient, and so is SORNA.    A registry of felons, especially a specific class of felons, which allowed no due process, and was clearly punitive in nature, was not permissible in 1957; it certainly is not permissible now.    "The Constitution 'neither knows nor tolerates classes among citizens.'" *Romer v. Evans*, 517 US 620, 623 (1996)[131]

88)    Indeed, the Eleventh Circuit has held that the classification of a prisoner as a sex offender, as well as the requirement that he complete sex offender treatment as a precondition for parole eligibility, implicated a liberty interest under the Due Process Clause.[132]    Accordingly, for the above reasons, Plaintiff's prosecution for failure to register would violate his right to due process of law, as well as the *Ex Post Facto* Clause.

---

[131] *Romer v. Evans*, 517 US 620, 623 (1996) (quoting Justice Harlan in *Plessy v. Ferguson*, 163 US 537, 559 (1896) (dissenting opinion))

[132] See *Kirby v. Siegelman*, 195 F.3d 1285, 1292 (11th Cir. 1999); see also *Coleman v. Dretke*, 395 F.3d 216, 223-24 (5th Cir. 2005) (holding that Texas statute violated procedural due process rights of an individual who was required to register as a sex offender without first being afforded a hearing); *Neal v. Shimoda,* 131 F.3d 818, 831 (9th Cir. 1997) (holding that a state must provide a hearing before classifying a prisoner as a sex offender and requiring the prisoner to complete a treatment program as a condition to parole eligibility). See generally Vitiello, "*Punishing Sex Offenders: When Good Intentions Go Bad*," 40 Ariz. St. L. J. 651 (2008)

5.

## The Attorney General's Regulation Retroactively Applying

## SORNA Violates the Administrative Procedures Act

89)     Attorney General Gonzales' Regulation, 28 CFR §72.3, which purportedly

applies SORNA retroactively, violated the Administrative Procedures Act

("APA"), codified at 5 USC §553, because it was promulgated absent a 30-day

notice and comment period.  As discussed above, on February 28, 2007, A.G.

Gonzales issued a regulation retroactively applying SORNA to all persons

convicted of a sex offense prior to July 27, 2006 -- the date Congress enacted the

AWA with SORNA.[133]

90)     The APA requires agencies to publish a proposed rule in the Federal

Register and give interested parties the opportunity to submit comments and other

relevant material before the rule becomes effective.[134]    Generally, a substantive

rule must be published in the Federal Register at least 30 days before it becomes

active.[135]    However, the APA permits agencies to enact rules without a notice and

comment period for "good cause" where it is "impractical, unnecessary, or

contrary to the public interest."[136]    The "'good cause' exemption is to be 'narrowly

construed and only reluctantly countenanced.'  The exemption is not an 'escape

---

[133] See 28 CFR §72.3
[134] 5 USC §553(d)
[135] See *id.*
[136] 5 USC §553(b)

clause'; its use 'should be limited to emergency situations.'" *Utility Solid Waste Activities Group v. Environmental Protection Agency*, 236 F.3d 749, 754 (D.C. Cir. 2001)[137]

91)     Attorney General Gonzales erroneously relied upon the "good cause" exception in foregoing the public notice and comment period. A.G. Gonzales claimed that notice and comment was "impractical, unnecessary, and contrary to the public interest."[138]   In support of his assertion, A.G. Gonzales stated that the "immediate effectiveness of the rule is necessary to eliminate any possible uncertainty about the applicability of the AWA's requirements."[139]   Moreover, A.G. Gonzales explained that "[d]elay in the implementation of [the] rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect the public from sex offenders through prosecution and the imposition of criminal sanctions."[140]   However, these assertions have no basis even when evaluated against the Attorney General's own manual interpreting the "good cause" exception under the APA.

92)     According to the Attorney General's Manual, a 30-day public notice and comment period is "impracticable" under the APA when "an agency finds that due

---

[137] *Utility Solid Waste Activities Group v. Environmental Protection Agency*, 236 F.3d 749, 754 (D.C. Cir. 2001) (omitting citations and quotations)
[138] 72 Fed. Reg. at 8896
[139] *Id.*
[140] *Id.*

and timely execution of its functions would be impeded by the notice otherwise required in [§553]."[141]   In passing the rule, A.G. Gonzales makes little more than a bare recitation that delay would impede the protection of the public.

93)      Finally, the notice and comment period was not "unnecessary."   The Attorney General's Manual explains that this term refers to "the issuance of a minor rule in which the public is not particularly interested."[142]   Certainly, an all encompassing rule that purported to make SORNA retroactive to all offenders who ever committed a sex offense fails to meet this definition of "unnecessary."

94)      For all these reasons, A.G. Gonzales had no "good cause" to excuse the APA's notice and comment period. Thus, the rule should be invalidated.[143]

---

[141] *Utility Solid Waste Activities Group*, 236 F.3d at 754 (citing Attorney General's Manual on the Administrative Procedures Act, at 30-31 (1947))

[142] *Id.* (citing Attorney's Manual at 31); see also *South Carolina v. Block*, 448 F.Supp. 1004, 1016 (D.S.C. 1983) (finding that the "unnecessary" exemption is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public.")

[143] See *Nat'l Org of Veterans' Advocates, Inc. v. Sec'y of Veteran's Affairs*, 260 F.3d 1365, 1375 (Fed. Cir. 2001) ("Failure to allow notice and comment, where required, is grounds for invalidating the rule.")(citing *Auer v. Robbins*, 519 US 452, 459 (1997))

6.

## SORNA and the Missouri Sex Offender Registration Laws

## Impermissibly Encroach Upon State Power and Therefore

## Violate the Tenth Amendment

95)     The registration requirements, which impose a federal obligation on

offenders to register in individual state-created and state-maintained sex offense

registries, are an unconstitutional encroachment of federal power on state

sovereignty. The registration requirements therefore violate the Tenth Amendment

and are invalid. As described above, in order to violate §2250, a defendant must

first be required to register under SORNA. Since the registration requirements are

unconstitutional, Plaintiff cannot be required to register under SORNA.[144]

96)     The Tenth Amendment provides that the "powers not delegated to the

United States by the Constitution, nor provided by it to the States, are reserved to

the States respectively, or to the people."[145]     The Tenth Amendment has been

applied to uphold the principles of federalism by limiting the power the federal

government may exercise over state activities.     For example, the Tenth

---

[144] See generally, Alicia Sterrett, NOTE: *The Case for Kentucky Sex Offenders: Residency Restrictions and Their Constitutional Validity*, 96 Ky. L. J. 119 (2007/2008) This note examines the plight of these offenders through the looking-glass of federal and state legislation passed to thwart these "predators" and the constitutional challenges many of them have raised. *Id*.
[145] US Const., Amend. X.

Amendment prohibits the federal government from commandeering state officials into enacting or administering federal law.[146]

97)    Although SORNA offers the states financial incentives to create SORNA-compliant registries,[147] few states have yet created such registries. Specifically, "cash-strapped California has informed the Justice Department that it will not implement SORNA even though it would mean a loss of about $2 Million in federal funds in 2009. The reason is clear; it is estimated that it would cost California more than $59 Million to implement everything in the new law."[148] These federally-mandated registries come with strings attached. Funding that the state provides to the Federal Government gets reallocated back to the states with strings attached. When states try to recoup their revenue; federal interference tramples on the states' rights under the Tenth Amendment.

---

[146] *Printz v. US*, 521 US 898, 935 (1997); See generally, Amir Efrati, *Making Punishments Fit the Most Offensive Crimes*, Wall Street Journal, October 23, 2008, available at http://online.wsj.com/article/SB122471925786760689.html?mod=googlenews_wsj Explores the explosion of child pornography prosecutions for 12 years. *Id*. The mean sentence rose from 22 months to 80 months. *Id*. The war on drugs has transitioned into the war on pornography. Troy Stabenow critiques the child pornography sentences saying "You shouldn't punish someone for something they have not done -- It's not American." Cites *US v. Ontiveros*, No. 07-CR-333, (E.D. Wisc., July 24, 2008) that notes that sex offenses are not committed by strangers, and that "sex offender" is a shameful title that will follow the defendant for the rest of his life. Also a "court should exercise caution to avoid imposing sentences for a crime some fear a defendant could commit in the future, instead of for the crime he actually committed and for which he is before the Court. *Id*.

[147] 42 USC §16925

[148] Tracey Brown, The Providence Journal, *Implementing Sex Offender Registration Laws May Prove Impossible*, March 15, 2009

98)     Additionally, Rhode Island is struggling with trying to comply with the July

27, 2009 deadline for implementation to retain their $80,000, or 10% of their total

$800,000 they receive from the Omnibus Crime Act of 1968.[149]   Rhode Island also

cites "prohibitive costs" associated with complying with SORNA and the

legislature admits that they don't know if they will ever be able to comply fully

with SORNA.[150]   Many other states face the same dilemma. However, the federal

registration requirements, which require individual sex offenders to register in their

state of residence, are currently in effect.[151]     The registration requirements,

therefore, force Missouri state officials who run the local registries to accept

federally required sex offender registrations before their state chooses to adopt the

SORNA provisions voluntarily.[152]

99)     In *Printz*, the Supreme Court struck down a law requiring local law

enforcement officials to conduct background checks of prospective handgun

purchasers.    The Court held, "[t]he Federal Government may neither issue

directives requiring the states to address particular problems, nor command the

States' officers, or those of their political subdivisions, to administer or enforce a

---

[149] *Id.*

[150] *Id.*

[151] 42 USC §§16913-26; 72 CFR 8894, 8895, 2007 WL 594891 (2007)

[152] See generally, Farley, NOTE: *The Adam Walsh Act: The Scarlet Letter of the Twenty-First Century*, 47 Washburn L. J. 471 (2008)

federal regulatory program."[153]   The local law enforcement officials in *Printz* are analogous to the law enforcement officials who run state sex offender registries.

100)     Just as Congress has no power to compel local law enforcement to conduct federally-mandated background checks, it has no power to compel local law enforcement to accept registrations from federally-mandated sex offender programs.[154]   SORNA's registration requirements are therefore invalid under the Tenth Amendment and a ruling in declaratory judgment should issue.

7.

### The Effects on the Plaintiff

101)     Plaintiff accepted a plea agreement and plead guilty to a federal sex offense pursuant to 18 USC §2252A(a)(5)(B).  Plaintiff is required to register as a sex offender.  Plaintiff is extremely worried that he will be subjected to harassment and embarrassment upon community notification of his sex offender status.  He never would have accepted the plea deal if he knew what the State of Missouri would subject him to.

---

[153] 521 US at 935; see also New York v. US, 505 US 144 (1992) (Congress did not have the power to compel the states to enact a federal program regulating the disposal of toxic waste)
[154] See also *US v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988) ("the federal government has no constitutional authority to interfere with a state's exercise of its police power except to the extent the state's action intrudes on any of the spheres in which the federal government itself enjoys the power to regulate").

102)    Plaintiff fears for his safety once notification is implemented. *Romer v. Evans*, 517 US 620 (1996)[155] opines that respect for equal protection "explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare."[156] "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'"[157] Plaintiff believes that by removing all means of protection (e.g. the right for a felon to protect life and property, by taking away every mechanism to defend themselves, then placing sex offender on a globally accessible website) without consideration that any citizen could use the information contained on the site to inflict vigilante justice upon any registrant, exposes every sex offender to another round of punishment. This mocks the legal maxim that everyone has the same protection provided by law enforcement.

103)    In the State of Missouri, for example, Saint Louis County has 54.85 officers per 1000 citizens. Ripley County, in which the Plaintiff resides, only has 0.5 officers per 1000 citizens. Saint Louis County has 713 officers to cover 507.81 square miles; Ripley County only has 7 officers to cover a vast rural area of 629.47 square miles; therefore, the County of Saint Louis has over 2,742% more police protection available.[158] It takes over 30 minutes to have a call responded to by the Sheriff's department in Ripley County. Additionally, in a county such as Ripley,

---

[155] *Romer v. Evans*, 517 US 620, 134 L.Ed.2d 855 (1996)

[156] *Id*. at 866-67

[157] *Id*. at 866-67 (internal citations omitted)

[158] See Exhibit 2

where 911 has not been implemented, finding a residence could double the response time. With absolutely no way of protecting himself, Plaintiff will be on his own, at the hands of anyone that would wish to use the registration information to search out and harm a neighboring sex offender, or mistake a neighbor's house for his and harm others mistakenly. Plaintiff contends it will be akin to "shooting fish in a barrel."

104)    Plaintiff is from a very small and close-knit community of 600. He grew up outside Naylor, Missouri on his parent's farm and lived his first twenty-one years there. Plaintiff started community college in Poplar Bluff, Missouri after finishing high school with honors. After two years he transferred to Southeast Missouri State University and earned a Bachelor's of Science in Applied Computer Science. He also minored in Electronic Physics. All Plaintiff's mentors are his high school teachers. This all will be shattered if he is listed on any sex offender registry to be advertised in effect as a "monster," a predatory being.

105)    With a background in the Information Technology (IT) field, Plaintiff has already spent a great deal of time as a computer technician, network technician, and support specialist. He wishes to continue in this field of business upon release. He fears that he will be limited in employment on the grounds of an arbitrary application of ambiguous terms as applied by the special and standard conditions of his supervised release.

106)    Plaintiff hopes to use the knowledge that he has learned about stock market

index trading to fund his entrepreneurial enterprises.  This is all done with the aid

of a computer, as is most contemporary activities in business.  Plaintiff fears that

the combination of not finding or being able to create his own employment, strict

residency restrictions, and public ridicule and scorn, will drive him away from his

community and family, making reintegration into society an unreachable goal.

107)    Plaintiff fears that his ability to find employment may be compromised if his

potential employers are notified or notification procedures are implemented.

108)    Plaintiff believes that posting of his photograph and name and other

information on neighborhood fliers and on any community notification website

will result in his being singled out for scorn, ridicule, threats of violence, and

destruction of property.

109)    Plaintiff is worried he will not be able to find suitable long-term housing as

most residential housing is located near a park or bus stop where children frequent.

110)    Plaintiff finds himself being punished for something he has not and will not

do as if he was stuck in the motion picture, *The Minority Report*.[159]    He is

---

[159] *Minority Report* was a Stephen Spielberg film from 2002, based in the year 2054. Washington
D.C. was piloting a program set for expansion to the entire country. The Department of Justice
was reviewing the new unit of the police department called "Pre- Crime." Pre-Crime officers
were relying on the visions of three mutated humans called "precogs" which could see crimes in
the future. Tom Cruise's character, Anderton, which was the head detective of the Pre-Crime
Unit, was alerted to a new murder that will happen in 36 hours. The catch was that the
perpetrator was Anderton, and the victim was unknown to him. In an attempt to clear his name,
*Footnote continued on the next page.*

concerned about the Constitutional implications of proactive punishment based on statistics that shows a recidivism rate of sex offenders reconvicted of a new sex offense as small as 0.5%. [160]   Yet, the sanctions grow stronger by the day on the incorrect assumption that sex offenders have a recidivism rate for another sex crime of over 80%.

111)   Plaintiff is worried that his friends or family may become targets or caught in the crossfire. He wishes not to be the source of any further shame to his family. He also wishes for a second chance to demonstrate that he can be a productive member of society and a credit to his community.

---

he speaks with the creator of the project and finds that the system isn't as accurate as they were led to believe.

When the three precogs could not agree, information that matched two of the three were reported and the third was filed as a "minority report," of which Anderton finds that his had been deleted. Anderton comes to find that the victim may have had something to do with his son's kidnapping, but was reluctant to fulfill his destiny with committing the murder. Anderton puts the pre-crime cops on a chase and was eventually apprehended. Anderton's ex-wife, Lara, finds the pre-crime director has been manipulating the system to hide a murder he had committed. Lara breaks Anderton out of prison from stasis, and crashes a reception with the director. After playing a video of the director killing his victim, he tracks down Anderton to kill him.

Anderton points out to the director that if he kills Anderton, he will prove pre-crime works at the cost of a life sentence; if not, the whole system falls apart. The director resolves the situation by committing suicide.

The Department of Justice abandons the project and Congress declares it unconstitutional to pro-actively convict citizens for crimes they have yet to commit.

Minority Report was nominated for an Oscar, won 16 other awards, and gained 47 separate nominations;   See generally: Mark Niles, *Self-fulfilling Prophecy: The Minority Report, 'Pre-Crime,' and the Ideological Content of Science Fiction*, A paper presented at the annual meeting of the Law and Society Association, July 6, 2006, available at http://www.allacademic.com/meta/p113452_index.html

[160] See Exhibit 1

112)    Plaintiff is also concerned about any vindictive punishment by Acting

United States Attorney Michael W. Reap, District Attorney Hanaway's successor,

and any retribution he may bring his way.  D.A. Hanaway has been quoted many

times, and in particular in the Daily American Republic as saying, she is sending

"a message to those who believe they can possess images of underage children

without any consequence-- you will be prosecuted, and face a lengthy prison

sentence,"[161] once again lumping all sex offenders in with Michael Devlin of

Kirkwood, Missouri who kidnapped two boys, one for years, and repeatedly raped

them until he was apprehended in 2007.[162]    Plaintiff is worried about what D.A.

Hanaway did in office[163] and if it will continue with her successor, D.A. Reap.

Plaintiff already feels pressure from the federal and state officials and wonders

how much further it will go.

---

[161] http://www.projectsafechildhood.gov/docs/DOJ_PSC_inmanconv.pdf

[162] http://www.co.st-louis.mo.us/scripts/pa/attachment/papress/index.cfm?ViewMe=8499

[163] Chet Pleban, the attorney for Officer Bobby Lee Garrett, filed a motion alleging that St. Louis
Circuit Attorney Jennifer Joyce and U.S. Attorney Catherine Hanaway committed prosecutorial
misconduct by talking to the Post-Dispatch for a news story published Feb. 23. . . Pleban's court
filings say that the statistics provided by Joyce and Hanaway - and their statements to a reporter -
violated the Missouri Supreme Court's rules of professional conduct by obliterating Garrett's
presumption of innocence. Hanaway violated the U.S. attorney's office rules, and both tainted
prospective jurors and witnesses, he wrote. "Moreover, the comments made by Hanaway and
Joyce were designed to prejudice this Defendant and will have the intended effect ... by creating
the impression in the minds of prospective jurors that Defendant is guilty of additional uncharged
crimes and that this Defendant is a liar, whose testimony cannot be trusted," one filing says.
http://www.stltoday.com/stltoday/news/stories.nsf/laworder/story/F46AC7F8F18996968625759
40014685D?OpenDocument

113)    Plaintiff has suffered great stress and anxiety at the prospect of complying
with SORNA and the Missouri State registration statutes and fears huge financial
losses stemming from denial of potential employment as a result of potential public
access of internet registration postings.  Once posted, internet cache servers will
retain past information for an indeterminate period of time whether names are
removed or not.  Prohibition of initial publication is the only recourse to prevent
such events.

114)    Plaintiff fears that he will suffer harm in the form of (a) loss of or inability to
obtain employment; (b) community backlash; (c) individual and random acts of
violence (d) inability to secure lawful housing; and (e) inability to attend religious
functions if SORNA and the Missouri Sex Offender laws as to registration,
community notification, and movement/residency/public access reduction laws are
allowed to stand, all on the assumption that Plaintiff may commit an offense.

V.

## First Cause of Action

Violation of the Fourteenth Amendment to the

United States Constitution under 42 USC §1983

(Due Process)

115) Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

116) Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

117) The SORNA and Missouri Sex Offender Laws are vague and ambiguous and fail to sufficiently define who is subject to the laws, what their effects are, and what the penalties for failure to comply with them are, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

118) SORNA and Missouri Sex Offender laws also violate the Due Process Clause because they reassess offenders and subject them to new restrictions and requirements, regardless of any actual risk to society and without the reasonable possibility of any hearing and without any requirement by the State of Missouri to provide offenders with any actual notice of their classification or any new prohibitions or requirements.

119)    Further, the SORNA and Missouri Sex Offender Laws violate the Due Process Clause of the U.S. Constitution because they fail to rationally further any legitimate governmental purpose.

120)    Plaintiff imminently will be, injured by these Constitutional violations, and the Plaintiff is entitled to declaratory and injunctive relief.

## VI.

### Second Cause of Action

### Violation of the First Amendment to the

### United State Constitution under 42 USC §1983

### (Free Exercise of Religion)

121)    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

122)    Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

123)    Because churches and other places of worship fall within the places certain sex offenders may not "knowingly be" in the proximity of (where children are present) under the Missouri Sex Offender statutes, regardless of the actual known risk of offenders.   The Missouri Sex Offender laws improperly interfere with offenders' rights to practice religion without undue governmental interference.

124)     The Plaintiff imminently will be injured by these Constitutional violations, and the Plaintiff is entitled to declaratory and injunctive relief.


VII.

### Third Cause of Action

Violation of the Fourteenth Amendment to the

United States Constitution under 42 USC §1983

(Substantive Due Process)

125)     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

126)     Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

127)     By impacting on the Plaintiff's ability to travel throughout Missouri, attend church or other religious services, go to Court or attorney offices, parent children, and live with his family, SORNA and the Missouri Sex Offender laws impinge on his fundamental right to free association, travel, and to raise children without undue governmental interference; all under the assumption that Plaintiff may commit an offense in the future.

128)     Plaintiff imminently will be injured by these Constitutional violations, and Plaintiff is entitled to declaratory and injunctive relief.

VIII.

## Fourth Cause of Action

### Violation of the Fourteenth Amendment to the

### United States Constitution under 42 USC §1983

### (Equal Protection)

129)     Plaintiff incorporates by reference each and every allegation contained in the

preceding paragraphs as set fourth fully herein.

130)     Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all

Federal and State Defendants in their official capacities.

131)     These laws are irrational, and designed only to burden an unpopular group.

SORNA and the Missouri Sex Offender laws thus violate the Equal Protection

Clause of the United States Constitution.  Disarming felons and then expecting law

enforcement to provide equal assistance (when the fact is there is a 2,742%

disparity in police protection)[164] also violates the Equal Protection Clause of the

United States Constitution.

132)     Plaintiff imminently will be injured by these Constitutional violations, and

the Plaintiff is entitled to declaratory and injunctive relief.

---

[164] See Exhibit 2

IX.

### Fifth Cause of Action

Violation of the Eighth Amendment to the

United States Constitution under 42 USC §1983

(Cruel and Unusual Punishment)

133)   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

134)   Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

135)   SORNA and the Missouri Sex Offender laws impose extensive punishments, both on persons previously convicted of sexual offenses and prospectively, that are excessive in relation to the crimes offenders are convicted of.

136)   Community notification can subject offenders to violence at the hands of vigilantes.  Human Rights Watch, in a comprehensive 2007 study of sex offender laws (laws that were far less extreme than SORNA and the Missouri Sex Offender laws) and their effects and utility, found that public safety was not furthered by expansive notification and registration provisions, but offenders were subjected to vigilantism:

> "Information provided by state online sex offender registries, as well as information provided during community notification by law enforcement, is not just used by private citizens to determine what streets their children can walk on, or whom to avoid.  **Neighbors as well as strangers harass,**

**intimidate and physically assault people who have committed sex offenses. At least four registered sex offenders have been killed."[165]**

137)     Plaintiff imminently will be injured by Eighth Amendment violations, and the Plaintiff is entitled to declaratory and injunctive relief.

## X.

### Sixth Cause of Action

### Violation of Article 1, §9 of the

### United States Constitution under 42 USC §1983

### (*Ex Post Facto*)

138)     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

139)     Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

140)     The effect and intent of SORNA and the Missouri Sex Offender laws are punitive, and the Missouri Sex Offender laws impose new punishments on Plaintiff, including but not limited to the affirmative disability of having to

---

[165] p. 89, *No Easy Answers: Sex Offender laws in the United States*, Human Rights Watch, available at http://www.hrw.org/reports/2007/us0907/us0907web. pdf

periodically re-register in person,[166] banishment from their families and communities, and on offenders convicted before their enactment. Once again, all under the assumption that Plaintiff may commit an offense in the future.

141)    Plaintiff imminently will be injured by these Constitutional violations, and the Plaintiff is entitled to declaratory and injunctive relief.

## XI.

### Seventh Cause of Action

Violation of the Fifth Amendment to the

United States Constitution under 42 USC §1983

(Double Jeopardy)

142)    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

143)    Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

144)    The SORNA and Missouri Sex Offender laws impose new punishments on persons previously convicted, and imposed registration duties, community notification, and movement and residence restrictions based on the crime originally

---

[166] See *Doe v. DPS ex rel. Lee*, 271 F.3d 38, 59 (Stating that "[t]he notion that meeting the burdens of the [state] registry law . . . is comparable to paying taxes or complying with census and driving registration regulations is *breathtaking*.") (emphasis added)

committed, rather than any risk of recidivism, in violation of the Double Jeopardy Clause of the United States Constitution, again under the assumption that Plaintiff may commit an offense in the future.

145)     The Plaintiff imminently will be injured by these Constitutional violations, and the Plaintiff is entitled to declaratory and injunctive relief.

## XII.

## Eighth Cause of Action

## Violation of Article I, §10 of the

## United States Constitution under 42 USC §1983

## (Contracts Clause)

146)     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

147)     Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

148)     The Missouri Sex Offender laws operate as a substantial impairment to the pre-existing contractual relationship between the Federal Government and Plaintiff's Guilty Plea Agreement by imposing new terms not negotiated which dramatically increase, and/or require extensive supervision, registration and

community notification, on the assumption that Plaintiff will commit a new offense.

149)    Plaintiff imminently will be injured by these Constitutional violations, and the Plaintiff is entitled to declaratory and injunctive relief.

## XIII.

## Ninth Cause of Action

## Violation of the State Contracts Clause

## of the Missouri Constitution (Art. I, §13)

150)    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as set forth fully herein.

151)    Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all Federal and State Defendants in their official capacities.

152)    For the same reasons that the Missouri Sex Offender laws violate the Contracts Clause of the United States Constitution, they violate the Contracts Clause of the Missouri Constitution.

XIV.

## Tenth Cause of Action

### Violation of the Fifth Amendment to the

### United States Constitution under 42 USC §1983

### (Takings Clause)

153)    Plaintiff incorporates by reference each and every allegation contained in the
preceding paragraphs as set forth fully herein.

154)    Pursuant to 42 USC §1983, this claim is brought by Plaintiff against all
Federal and State defendants in their official capacities.

155)    The Missouri Sex Offender laws, by placing residential and movement
restrictions on Plaintiff, unconstitutionally restricts Plaintiff's property rights by
classifying and segregating society to the point that it constitutes a regulatory
taking requiring just compensation, based on the assumption that Plaintiff may
commit an offense in the future.

156)    Plaintiff imminently will be injured by these Constitutional violations, and
the Plaintiff is entitled to declaratory and injunctive relief.

XV.

## Eleventh Cause of Action

Violation of the Separation and Distribution of Powers

Doctrine of the Missouri Constitution (Art. II, §1)

157)     Plaintiff incorporates by reference each and every allegation contained in the

preceding paragraphs as set forth fully within.

158)     Pursuant to 42 USC 1983, this claim is brought by Plaintiff against all

Federal and State Defendants in their official capacities.

159)     The SORNA and Missouri Sex Offender laws violate the State Separation

and Distribution of Powers Doctrine as it limits the judicial power of "sentence

finality" where the law vacates existing court judgments regarding sex offenders,

classifications, and community notification, and reverses final court judgments

setting the length of time that sex offenders must register.

160)     Plaintiff imminently will be injured by these Constitutional violations, and

the Plaintiff is entitled to declaratory and injunctive relief.

XVI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this Honorable Court for the following:

a. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Due Process Clause of the United States Constitution;[167]

b. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Due Process Clause of the Missouri Constitution;[168]

c. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the First Amendment of the United States Constitution;[169]

d. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the right to practice religion without governmental interference protected by the Missouri Constitution;[170]

e. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Equal Protection Clause of the United States Constitution;[171]

---

[167] U.S. Const., Amend. V
[168] Mo. Const. Art I., §10
[169] U.S. Const., Amend, I
[170] Mo. Const., Art I, §5

f.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the right to equal protection guaranteed by the Missouri Constitution;[172]

g.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the prohibition against cruel and unusual punishment contained in the United States Constitution;[173]

h.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the prohibition against cruel and unusual punishment contained in the Missouri Constitution;[174]

i.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the *Ex Post Facto* Clause of the United States Constitution;[175]

j.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the *Ex Post Facto* Clause of the Missouri Constitution;[176]

---

[171] U.S. Const., Amend, XIV
[172] Mo. Const., Art. I, §2
[173] U.S. Const., Amend VIII
[174] Mo. Const., Art. I, §21
[175] U.S. Const., Art. I, §9, cl.10
[176] Mo. Const., Art. I, §13

k.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Double Jeopardy Clause of the United States Constitution;[177]

l.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Double Jeopardy Clause of the Missouri Constitution;[178]

m.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Contracts Clause of the United States Constitution;[179]

n.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Contracts Clause of the Missouri Constitution;[180]

o.  A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Takings Clause of the United States Constitution;[181]

---

[177] U.S. Const., Amend. V and XIV
[178] Mo. Const., Art. I, §19
[179] U.S. Const., Art. .1, §10
[180] Mo. Const., Art. I, §13
[181] U.S. Const., Amend. V

p. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Takings Clause of the Missouri Constitution;[182]

q. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Separation of Powers Doctrine of the United States Constitution;[183]

r. A declaration that SORNA and the Missouri Sex Offender laws violate, both facially and as applied to the Plaintiff, the Separation and Distribution Doctrine of the Missouri Constitution;[184]

s. A declaration that SORNA and the Missouri Sex Offender laws are both void for vagueness, by omitting the technical definition of the "internet";

t. A permanent injunction prohibiting each Defendant from enforcing SORNA and the Missouri Sex Offender laws; and

u. Any further relief the Court deems appropriate.

---

[182] Mo. Const., Art. I, §§ 26, 27 and 28

[183] U.S. Const. , Art. III, §1

[184] Mo. Const., Art. II, §1

## XVII.

## Demand for Jury Trial

Plaintiff demands a trial by jury on all causes of action.

Respectfully Submitted,

Joshua J. Rideout
Reg. No. 32554-044
Federal Correctional Institution
P0 Box 9000
Seagoville TX 75159-9000
*PRO SE*

## AFFIRMATION

I affirm the above and forgoing is true and correct pursuant to 28 USC §1746.


Joshua J. Rideout
*PRO SE*


## CERTIFICATE OF COMPLIANCE

I hereby certify that this reply brief includes the information required by F.R.Civ.P. 55.03 and that it complies with the word count limitations of F.R.Civ.P.84.06(b). This brief was prepared with Microsoft Word for Windows 2003, Version 11, using Times New Roman 14-point font. The word-processing software identified that this complaint contains **13,048** words.


Joshua J. Rideout
*PRO SE*